IN THE COURT OF CRIMINAL APPEALS

AT NASHVILLE

APRIL 1995 SESSION

FILED

January 5, 1996

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | NO. 01C01-9409-CC-00328 |
| | ) | |
| Appellee | ) | WARREN COUNTY |
| | ) | |
| V. | ) | HON. CHARLES D. HASTON |
| | ) | |
| DARRYL GENE FARMER, | ) | (First Degree Murder) |
| | ) | |
| Appellant | ) | |

FOR THE APPELLANT:

Dale Potter
District Public Defender
P.O. Box 510
309 W. Morford Street
McMinnville, TN 37110
(Trial Only)

John E. Herbison
2016 Eighth Avenue South
Nashville, TN 37204
(Appeal Only)

FOR THE APPELLEE:

Charles W. Burson
Attorney General and Reporter
450 James Robertson Parkway
Nashville, TN 37243-0493

Amy L. Tarkington
Asst. Attorney General and Reporter
450 James Robertson Parkway
Nashville, TN 37243-0493

William M. Locke
District Attorney General

Larry Ross
Asst. District Attorney General
P.O. Box 410
Professional Building
McMinnville, TN 37110

OPINION FILED_____

JUDGMENT OF CONVICTION VACATED AND REMANDED FOR FURTHER
PROCEEDINGS

William M. Barker, Judge

OPINION

The appellant, Darryl Gene Farmer, appeals as of right pursuant to Rule 3 (b) of the Tennessee Rules of Appellate Procedure from his conviction of murder in the first degree following a jury trial in the Circuit Court for Warren County. The appellant was sentenced to life in prison. In this appeal he presents five (5) issues for our review.

(1) Whether the evidence was sufficient for a rational trier of fact to find the appellant guilty of first degree murder beyond a reasonable doubt;

(2) Whether the indictment against the appellant was invalid because of irregularities in the selection of the venire and/or the presence of an unauthorized individual during grand jury proceedings;

(3) Whether certain statements made by the prosecuting attorneys during closing argument constituted prosecutorial misconduct;

(4) Whether the trial court erroneously admitted into evidence statements made by the appellant on the night of his arrest;

(5) Whether the trial court erroneously admitted into evidence statements made by the decedent.

After a thorough review of the record in this case, the applicable law, and arguments of counsel, we conclude that with regard to issues one (1) through three (3) no reversible error appears in this case. However, because the record is inadequate with regard to whether the appellant's right to counsel was violated during police questioning, we remand the case for further factual findings on issue number four (4). We conclude that error exists with regard to issue number five (5).

Since the appellant has challenged the sufficiency of the convicting evidence, a summary of the facts established by the evidence is necessary.

On February 20, 1992, the body of Christopher Boyd was discovered on an isolated, dead-end dirt road in rural Warren County. It was apparent to the members of the Warren County Sheriff's Department who initially responded following the discovery of the body that Christopher Boyd had met a very violent death. The victim

2

had been shot at least once in the head, and there was also a large hole in the back of the victim's jacket. Initially, Sheriff's deputies were not sure if the hole in the back of the jacket had been caused by a gunshot wound or not. After viewing the secured crime scene, the district attorney notified the T.B.I. Crime Lab, and personnel from that office arrived later that evening.

Special Agent Steve Scott, a forensic scientist with the Tennessee Bureau of Investigation Crime Laboratory, and three other members of the forensic team arrived at the murder scene at around 10:40 p.m. on the evening of February 20, 1992. There were many shoe tracks and tire tracks leading up to the area where the body was discovered. After the body and other evidence surrounding the scene had been photographed, the victim was removed to a hospital in McMinnville. Thereafter, Scott and his team recovered some small bone fragments believed to have come from the victim's head. One such bone fragment was found nine feet three inches from the victim's body. Another was found thirteen feet from the body, and still another was found eleven feet ten inches from the body.

After being qualified as an expert in firearms, Scott testified that he found and recovered a slug and wadding from underneath the area of the head of the victim. It was Agent Scott's opinion that the wound to the back was caused by a twelve-gauge shotgun fired from a distance of somewhere between five and seven feet from the victim. He testified that the presence of lead residue on the jacket of the victim could indicate that the weapon was fired closer that five feet. He could not tell the specific gauge of the gun which was used to shoot the victim in the head, as the waddings removed from the wound were too mutilated. It was his opinion, however, that based on the damage to the skull of the victim and the location of the slug and waddings underneath the skull, that the victim was lying with his head against the ground when he was shot in the head. It was also his opinion that the head wound had been inflicted by a gun which had been fired shortly before it was used to shoot the victim in

3

the head because the wound to the face was consistent with an injury inflicted from a gun in which gas pressure had built up subsequent to a recent discharge.

Dr. Gretel Harlan performed an autopsy on February 21, 1992. Dr. Harlan testified that the shotgun wound to the victim's back was in the near-wound category, but that she could only estimate that the shot was fired from three to eighteen feet from the victim. She further concluded that the wound to the skull had been caused by a shotgun slug. She also categorized the head wound as a near-wound. Dr. Harlan was of the opinion that the shotgun wound to the back would have been fatal within a matter of minutes because of extensive injury to the victim's right lung. Dr. Harlan concluded that Mr. Boyd was first shot in the back and then in the head.

Doug Martin, an acquaintance of both the appellant and the victim, testified that approximately one week prior to the victim's death, the appellant told Mr. Martin that the victim was informing the police of the appellant's drug-selling activities and that Mr. Boyd needed to be killed. The appellant asked Mr. Martin to assist him in killing the victim. Mr. Martin refused. Martin thereafter told the victim what the appellant had said about him. The victim, according to Mr. Martin, did not believe that the appellant would harm him, and, in fact, Christopher Boyd told Martin that he and the appellant had plans to steal twenty-five pounds of marijuana.

Steve Pleasant, likewise an acquaintance of both the victim and the appellant, testified that he saw the victim on the afternoon of February 19, 1992, when the victim gave Mr. Pleasant a ride home from work. On that occasion, Pleasant saw the victim and the appellant engage in a conversation on the street, and thereafter the appellant followed the victim's truck to Mr. Pleasant's house where Mr. Pleasant was dropped off. The victim told Mr. Pleasant that he was going to buy the appellant's car, and that he wanted to drive it before he bought it. Lastly, Mr. Pleasant testified that the victim told him that he and the appellant were going to a barn to get some marijuana.

4

Jessie Michael Eldridge, Jr., a friend of the appellant, testified that on February 19, 1992, the appellant called him and said he needed to speak with him. Eldridge testified that the appellant seemed jumpy and nervous when he arrived. Farmer told Eldridge that he had killed the victim because of his belief that the victim was informing on him. He told Eldridge that he shot the victim once in the back and once in the face. The appellant further said that he and the victim were on the way to steal marijuana when they pulled up to the side of the road and started walking to where the marijuana was located. As they were walking up the dirt road the victim said, "You ain't going to shoot me, are you?" The appellant told Mr. Eldridge that he assured the victim that he was not going to shoot him because they were "good buddies." However, when the victim turned away he shot him in the back and then shot him in the face with a twelve-gauge shotgun. The appellant said that when he shot the victim in the head it blew his face away, and that after he shot the victim he burned the victim's clothes. The appellant asked him to provide an alibi for him which, at first, Eldridge did provide.

Ricky Johnson testified that during the early part of 1992, the appellant asked to borrow Johnson's twenty-gauge shotgun, saying that he was going hunting. Johnson recalled that the appellant returned the gun approximately two hours after he had borrowed it. Mr. Johnson testified that he did not have further contact with the appellant again until a year or so later. At that time, the appellant called Mr. Johnson and said, "Ricky, that gun I borrowed from you--I shot a man with it." Approximately three months later, the defendant called again and said, "I didn't kill nobody with that."

Following the murder of Christopher Boyd an extensive investigation began, and Agent Danny Wix, a seventeen-year veteran of the Tennessee Bureau of Investigation, entered the case about twelve days following the discovery of Boyd's body. Paralleling the murder investigation, authorities initiated an undercover drug operation in Warren County. During the course of the murder investigation and the

5

drug operation, the appellant became a prime suspect in the murder of the victim.   At

one point, Mike Eldridge was also a suspect.  Both were interviewed in the months

following the discovery of the body, and both denied any involvement in the killing.

On January 22, 1993, both the appellant and Mike Eldridge were arrested

separately in relation to the undercover drug operation.  They were brought to the

Warren County District Attorney General's office, and Agent Wix first interviewed

Eldridge.  Thereafter, Wix interviewed the appellant after advising him of his Miranda

rights.  Initially, the appellant denied any involvement in the murder of Christopher

Boyd.  Later in the evening, however, Agent Wix brought Mike Eldridge into the

interview room where the appellant was located, and Eldridge advised the appellant

that he had given the authorities a statement implicating the appellant in the killing of

the victim.

Soon thereafter, the appellant indicated that he would be willing to give a

statement if he could be promised that he would not receive the death penalty.  Wix

testified that both he and the district attorney general advised the appellant that no

such assurance could be made, and, after first telephoning his parents, the appellant

gave a statement which was reduced to writing by one of the assistant district

attorneys general.

In the statement, which was read into evidence before the jury, the appellant

indicated that he and Boyd got together on February 19,1992, after leaving work at

McMinnville Manufacturing.  The appellant stated that Christopher Boyd approached

him about a plan to steal some marijuana from a person identified as Harry Bess,

whom the appellant claimed to not know.  While waiting for it to become dusky dark,

the appellant said that he and Boyd drove around, consuming quantities of beer and

Valium.  The victim advised the appellant that they both needed to be armed when

they went to steal the marijuana, and it was at that point that the appellant went to the

home of Ricky Johnson and borrowed a shotgun and some shells.  The appellant said

6

that he was aware that the victim was already armed with a twenty-five caliber automatic pistol, which the victim normally carried with him.

The appellant stated that after they parked their car on McGee Cove Road and began walking up the dirt lane with Boyd in the lead, Boyd turned and said, "You got my pot, man." The appellant stated that when Boyd made the accusation Boyd had his gun in his hand and made a threat to the appellant. At that point, the appellant stated he feared that Boyd was going to shoot him, so he shot Boyd. He said he did not remember how many times he shot. After shooting Boyd, the appellant said he went back to his car and left, returning the borrowed shotgun to Ricky Johnson. After leaving Johnson's home, the appellant stated that he drove to the home of Mike Eldridge and advised Eldridge what had occurred.

The appellant did not introduce any evidence at the trial.

## SUFFICIENCY OF THE EVIDENCE

The appellant contends that the evidence introduced at trial was insufficient to support his conviction for first-degree murder. Specifically, he argues that there was not sufficient evidence to establish the essential elements of premeditation and deliberation. We disagree.

Where the sufficiency of the evidence is challenged, the relevant question for this court is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983); T.R.A.P. 13 (e).

A guilty verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves any conflicts in favor of the State's theory. State v. Hatchett, 560 S.W.2d 627, 630 (Tenn. 1978). On appeal, the State is entitled to the

7

strongest legitimate view of the evidence and to all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978). A verdict against the defendant removes the presumption of innocence and replaces it with a presumption of guilt on appeal. State v. Grace, 493 S.W.2d 474 (Tenn. 1973). The defendant has the burden of overcoming the presumption of guilt. State v. Brown, 551 S.W.2d 329 (Tenn. 1977).

Once a homicide has been established, it is presumed to be second-degree murder, and the State bears the burden of proof on the issues of premeditation and deliberation sufficient to elevate the offense to first-degree murder. State v. Brown, 836 S.W.2d 530 (Tenn. 1992). In Brown, our Supreme Court discussed the elements of first-degree murder at length. The Court said that the element of deliberation contemplates a lapse of time between the decision to kill and the actual killing. The Court further stated that "the deliberation and premeditation must be akin to the deliberation and premeditation manifested where the murder is by poison or lying in wait--the cool purpose must be formed and the deliberate intention conceived in the mind, in the absence of passion, to take the life of the person slain." Id. at 539 (quoting Rader v. State, 73 Tenn. 610, 619-20 (1880)). Thus, in order to convict a defendant for first-degree murder, a jury must find that the defendant killed with coolness (deliberation) and after reflective thought (premeditation). State v. West, 844 S.W.2d 144, 147 (Tenn. 1992); see also State v. Brooks, 880 S.W.2d 390, 392-93 (Tenn. Crim. App. 1993).

There is no specific time required to form the requisite deliberation. State v. Gentry, 881 S.W.2d 1, 3-4 (Tenn. Crim. App. 1993). Deliberation is present when the circumstances suggest that the defendant contemplated the manner and the consequences of his act. Id. at 4. While deliberation and premeditation are similar, they are defined as separate and distinct elements of first-degree murder. See T.C.A. § 39-13-201 (b) (deliberate act is "one performed with cool purpose" and premeditated

8

act is "one done after the exercise of reflection and judgment."); <u>see also</u> <u>State v. Brooks</u>, 880 S.W.2d at 392-93.  Deliberation and premeditation may be inferred from the circumstances where those circumstances affirmatively establish that the defendant premeditated his assault and then deliberately performed the act.  <u>State v. Richard Nelson</u>, No. 02C01-9211-CR- 00251 (Tenn. Crim. App., at Jackson, Oct. 13, 1993).  This Court has held that <u>Brown</u> requires "proof that the offense was committed upon reflection, 'without passion or provocation,' and otherwise free from the influence of excitement" before a second-degree, intentional murder can be elevated to murder in the first degree.  <u>State v. David L. Hassell</u>, No. 02C01-9202-CR-00038, Slip Op. at 3 (Tenn. Crim. App., at Jackson, Dec. 30, 1992).

Looking at the facts in the present case in the light most favorable to the State, as we are required to do on appeal, we conclude that the evidence is more than sufficient to support the jury's finding of premeditation and deliberation.  There was testimony that approximately one week prior to the shooting, the appellant advised Doug Martin that the victim needed to be killed because of the appellant's belief that the victim was a police informant.  Further there is evidence that the appellant attempted to enlist Martin to assist him in the killing.  There was also evidence from which the jury could reasonably conclude that the appellant borrowed a shotgun from Ricky Johnson for the purpose of executing Boyd.  Finally the jury heard testimony from Mike Eldridge and Ricky Johnson that the appellant admitted to each of them separately that he had in fact shot and killed the victim by first shooting Boyd in the back and then shooting him in the face as the victim lay dying.

There is no merit to this issue.


## VALIDITY OF THE INDICTMENT

The appellant presents two threshold issues which concern the validity of the indictment in this case.  Based upon a careful review of the record we conclude that

the indictment brought against the appellant was valid and the arguments advanced by the appellant on these issues are without merit.

The first petit jury empaneled to hear the case against him was quashed by the trial judge because of a procedural irregularity in the selection of the one thousand member jury venire. The grand jury which indicted the appellant was drawn from the same one thousand member venire as the quashed petit jury.   In order to select a grand jury in Warren county, the  jury commissioners, not a clerk,  are to meet and gather names of eligible citizens from the thousand member jury venire to serve as jurors for a period of two years.  Tenn. Code Ann. § 22-2-302 (1994 Repl.).  In this case, the clerk of the Jury Commission of Warren County participated along with the jury commissioners in the selection of the one thousand member jury venire, as well as in the selection of two hundred fifty members of the panel for each term of court.  It is upon these facts the appellant claims that the indictment against him is invalid.

In Flynn v. State, 203 Tenn. 337, 313 S.W.2d 248 (1958), the Supreme Court of Tennessee held that a departure from a prescribed method of impaneling a grand jury, in the absence of fraud or prejudice, does not render that grand jury illegal nor its acts invalid.  See also State v. Boyd, 867 S.W.2d 330, 337 (Tenn. Crim. App. 1992). The appellant does not contend that there was any fraud committed during the selection of the jury venire from which the grand jurors who indicted him were selected.  Further, the appellant has not shown that he was prejudiced by the procedure. That the trial judge quashed the petit jury because of the improper selection procedure in no way vitiates the authority of the grand jury which indicted the appellant.  At most,  the departure from the procedural requirements of  jury selection rendered the grand jury a de facto grand jury.  In Flynn, the Supreme Court held that a de facto grand jury is imbued with the same authority to indict as a properly selected grand jury.  State v. Flynn, 313 S.W. 2d at 252.   Therefore, the defendant's indictment was valid.

10

The appellant also contends that the presence of an unauthorized person in the grand jury room during the taking of testimony and the deliberations of the grand jury was so prejudicial to the judicial process that this Court should set aside the indictment issued against him in this cause.

The grand jury foreman in Warren County at the time the indictment was returned against the appellant had been serving as the grand jury foreman for almost ten years. A new grand jury foreman had been chosen by the trial judge to take over on April 1, 1993. The trial judge authorized Gerry Gipson, the new jury foreman, to be present during a portion of the grand jury proceedings so that he could become familiar with the process and learn how the grand jury operates.

Tennessee Rule of Criminal Procedure 6 (h) (1) provides that the district attorney general shall not be present, "nor shall any other officer or person be present when the question is taken upon the finding of an indictment." (emphasis added). Additionally, Tennessee Code Annotated section 8-7-501 provides that at grand jury proceedings the district attorney general or his designated assistant shall not be present when the question is taken upon the finding of an indictment. There is no allegation that Mr. Gipson was present during the taking of the grand jury's vote, and the testimony clearly established that, in fact, Mr. Gipson was not present during the grand jury vote. Importantly, the testimony at the hearing was that Mr. Gipson did not participate in any deliberation of the grand jury.

While we do not condone the presence of a grand jury foreman "trainee" or any departure from the rules and statutes governing grand juries, we hold that Mr. Gipson's presence in the grand jury room during grand jury proceedings was not so prejudicial to the judicial process as to merit a dismissal of the indictment in this case. In Sadler v. State, 124 Tenn. 50, 53, 136 S.W. 430 (1911), the Tennessee Supreme Court held that although it was error for a court officer to remain in the grand jury room during portions of their proceedings, such casual presence of a court officer did not

11

have the effect of vitiating the indictment where there was no showing that the officer attempted to interfere with or influence the grand jury in its action.

The purpose of grand jury secrecy is to insure that the jurors

> may discharge their duties without apprehension
> of any hurt from an accused or some other person;
> to secure the utmost freedom of disclosure of alleged
> crimes by prosecutors; to conceal the fact that an
> indictment has been found against an accused who
> is not yet in custody; to prevent perjury and subornation
> of perjury to the extent that, if testimony given before
> the grand jury were known, the accused or a confederate
> might attempt to disprove it by procuring false testimony;
> and to protect an accused citizen from public disgrace
> in a case where there is not enough evidence to support
> a criminal charge.

Rippy v. State, 550 S.W.2d 636, 642 (Tenn. 1977).

We hold that the attendance of Mr. Gipson in the grand jury room during its deliberations did not prejudice the judicial system because there was no indication that he participated in any way, shape or form in the proceedings, including the deliberations, and he was never allowed to remain in the jury room while the vote was being taken. Accordingly, we hold that the indictment in this case was valid.

## PROSECUTORIAL MISCONDUCT

The appellant next contends that certain remarks made by the prosecutors during their closing arguments were so inflammatory and prejudicial that they affected the verdict to the prejudice of the defendant.

Among the factors considered by this court when reviewing an allegation of prosecutorial misconduct are: the intent of the prosecutor, the curative measures undertaken by the court, the improper conduct viewed in context and in light of the facts and circumstances of the case, the cumulative effect of the remarks with any errors in the record, and the relative strength or weakness of the case. Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976). In order to be entitled to relief,

12

the appellant is required to show that the argument of the prosecutor was so inflammatory or the conduct so improper that it affected the verdict to his detriment. Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965).

Of the four statements objected to on appeal by the appellant, only one was objected to during the trial. It is well settled that without a contemporaneous objection to a prosecutor's statements, the error is waived. State v. Sutton, 562 S.W.2d 820, 825 (Tenn. 1978); State v. Compton, 642 S.W.2d 745, 747 (Tenn. Crim. App. 1982). The appellant acknowledges this, but urges this Court to find that the statements were plain error. Tennessee Rule of Criminal Procedure 52 (b) provides that "[a]n error which has affected the substantial rights of an accused may be noticed at any time, even though not raised in the motion for a new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice." Because we have determined that none of the statements individually or collectively constitute prosecutorial misconduct, we conclude that the plain error doctrine has no application in this case.

The first statement to which the appellant objects was the statement of the district attorney that the appellant shot the victim at a range somewhere between six (6) and twelve (12) inches from the victim's back. The proof showed that the wound to the back was inflicted by a shotgun at close range. However, there was no evidence that the weapon was discharged from a range of six (6) to twelve (12) inches from the victim's back. While we agree that the prosecutor misstated the evidence as to the distance of the weapon from the back of the victim, we cannot agree that such a misstatement likely affected the verdict to the appellant's detriment. Whether the weapon was fired from six (6) inches or seven (7) feet does not affect the essential determination required to be made by the jury to support their finding that the appellant was guilty of murder in the first degree.

13

The appellant next contends that several remarks made by the prosecutor concerning the testimony of Doug Martin constituted prosecutorial misconduct. The prosecutor stated several times during his closing statements that in a conversation with Doug Martin, the appellant called the victim a "narc." The appellant correctly points out that the word used by Mr. Martin was "snitching." We do not believe that the term "narc" as opposed to "snitch" had the potential to unfairly inflame the jury such that the appellant was prejudiced by the remark in this case.

Again, while purporting to quote testimony of Doug Martin, the district attorney general stated that Mr. Martin said, "Your boy needs killing." The appellant correctly states that there was never testimony that the appellant referred to the victim as a "boy." The appellant regards this as an attempt on the part of the prosecution to inflame the jury by attributing a racial slur to the appellant. The state contends that the use of the term "boy" was not intended as a racial slur, but was rather a slang term used to define a friend or buddy. It is exceedingly difficult for this Court to assess what the prosecutor meant by the use of the term "boy." It is true that the term has often been used as a repugnant racial slur. After a careful review of the record, we cannot conclude that the prosecution was attempting to inflame the jury by attributing racist sentiment, language or intent to the appellant. Even if the use of the term "boy" was intended as a racial slur, we cannot conclude that this isolated event would have inflamed the jury to such a level as to affect the verdict to the appellant's detriment. This is particularly true in light of the overwhelming evidence heard by the jury of the appellant's guilt in this case.

The appellant also takes umbrage at a statement made by the attorney general in which he purported to quote the testimony of Mike Eldridge. The prosecutor stated that Mike Eldridge's testimony was that the appellant told him, "Then, as he was laying there gasping for breath, helpless, I stuck the gun to his head and blew his face off." As the appellant correctly points out, the testimony of Mike Eldridge on this point was

14

that the appellant "said he shot him once in the back and once in the face." Further, Mr. Eldridge testified that the appellant "said at that time, he shot him in the back and, then, shot him in the face. . . He said he blowed his face out--everything but the bottom part." Most of what the prosecutor told the jury as a quote of Mr. Eldridge's testimony was essentially what Mr. Eldridge testified to, but was clearly not a direct quote. One portion of the prosecutor's remarks which finds no support in the record as being testimony of Mike Eldridge is that the appellant described the victim as gasping for breath and helpless. While this certainly created a strong visual image for the jury, we find that this statement was not so prejudicial as to affect the verdict improperly. Additionally, there was testimony from Dr. Gretel Harlan that the appellant was alive at the time he was shot in the back and that the back wound would have killed him within a matter of minutes. It is, therefore, not inconceivable that the jury might have concluded on its own that the victim was gasping for breath moments before his death. In any event, as with the other remarks made by the prosecution, these remarks do not go to the heart of the essential elements of the crime charged for which there was overwhelming evidence of guilt.

Finally, the appellant objects to the remarks of the prosecution wherein the attorney general purported to quote the appellant as saying, in response to learning that Mike Eldridge had informed the government that the appellant committed the murder, "General Lock, if I tell you the truth, you are going to put me in the electric chair. Fellows, if I tell you the truth, I am going to die. Just promise me you won't put me in the electric chair, and I will tell you the truth." The appellant's argument is that the actual statement made by the appellant was made to Agent Wix and the statement was: "I will make a written statement, but promise me you won't give me the death penalty." Additionally, the appellant contends that there is no indication in the record that this conversation took place in response to anything said by Mike Eldridge. Again, while the appellant is correct that the words used by the prosecution were not a

15

direct quote, the essence of the statement was true, and we find that whatever prejudice might have followed from such a statement was avoided by the trial court's jury instructions which were that the jury should not regard remarks made by either the prosecuting attorneys or the appellant's counsel as evidence.

## ADMISSION OF APPELLANT'S STATEMENT

The appellant also contends that the trial court erred in admitting into evidence the statement he gave to Agent Wix on the night of his arrest.

Prior to trial the trial court conducted an evidentiary hearing upon the appellant's motion to suppress the use of his statement. The appellant argued that his statement was taken in violation of his rights against self-incrimination guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, section 9, of the Tennessee Constitution.

As a preliminary matter, we conclude that the trial court's initial ruling from the bench following the suppression hearing was incorrect. The trial judge stated that whether a statement was taken in violation of Miranda, "...comes, frequently, down to a question of fact for the jury." The court further stated that it would allow the statement into evidence,

> ...but warn the jury that it allegedly was done in an
> improper fashion and cannot be considered. In other
> words, I pass on it, first, and, then, I hand it to the jury - or
> not.

In State v. Pursley, 550 S.W.2d 949 (Tenn. 1977), the Tennessee Supreme Court held that determining the admissibility of a criminal defendant's confession is the sole function of the trial judge, not the jury. Although the court initially indicated that it would allow the jury to make a determination on the voluntariness of the defendant's statement to the government, in the written order filed by the court in which the motion to suppress was denied, the trial court stated:

16

> . . . that the defendant was appropriately advised of his rights. That a knowledgeable and intelligent waiver of his right to counsel was made. Based upon the totality of the circumstances, it is found that this was a non-coercive questioning, that the defendant wanted to talk and that his will was not overborne.

Additionally, in its instructions to the jury, the trial court did not invite the jury to determine the legal issue concerning whether the statement was taken in violation of the defendant's right to counsel. Rather, the court instructed the jury that the decision to believe whether the confession or any part of it was untrue or never made was their decision alone. Although the court stated that as a preliminary matter the statement was admissible but that it would allow the jury to decide the issue ultimately, the jury was never actually asked to pass on this legal question. Accordingly, we conclude that the appellant was not prejudiced by the trial court's initial oral ruling.

The appellant contends that although he was given and understood his Miranda warnings prior to questioning, sometime during the interrogation, he asked for an opportunity to confer with an attorney but was denied that right prior to giving his statement.

Testifying at the suppression hearing were the appellant, Agent Wix, and Attorney Robert W. Boyd, Jr. of the District Attorney General's office.

Agent Wix testified that the appellant was brought to the library at the District Attorney General's office after being arrested on drug charges. Wix advised the appellant of his constitutional rights and then began questioning him in regard to the drug charges. Later the questioning turned to the murder of Christopher Boyd. At first the appellant denied any knowledge of the murder and refused to answer questions. However, Agent Wix said that the appellant made a number of incriminating admissions regarding the murder after Mike Eldridge was brought into the room and told the appellant that he had informed the police of the appellant's involvement in the murder of Christopher Boyd. Wix testified that at no time did the appellant ever request to confer with an attorney but did request to be allowed to telephone his

17

parents. Wix testified that appellant's request to telephone his parents was honored, and after speaking by telephone with his mother, the appellant completed his oral statement. Robert Boyd transcribed the statement in long hand, read it to the appellant, and the appellant signed it.

The appellant testified that following his arrest on the drug charge he was advised of his Miranda rights and told Agent Wix that he did not need an attorney. He said that when the questioning later turned to the murder that he was again read his rights by Agent Wix.

The appellant testified that he told Agent Wix that, "I did not shoot anyone, and that I did not have nothing to say about it." The appellant testified that after Mike Eldridge was brought in to the room where the appellant was being questioned and advised the appellant that he had "told them everything," the appellant said to Agent Wix and Mr. Boyd, "I think I need an attorney . . . I need to call an attorney."

Robert Boyd testified that he was present during the questioning of the appellant, and, on cross-examination, said:

> I know we discussed whether or not he wanted a lawyer.
> He may have said, "Maybe, I need to talk to a lawyer, or
> maybe I don't." But I don't--I know he never asked to talk
> to a lawyer. I know he was afforded the opportunity on two
> or three occasions to ask for one if he wanted to do that.

The Fifth and Fourteenth Amendments to the United States Constitution require that once a person in custody requests counsel, all interrogation must cease until an attorney is present. Miranda v. Arizona, 384 U.S. 436, 474, 86 S. Ct. 1602, 1627, 16 L. Ed. 2d 694 (1966). Article I, section 9, of the Tennessee Constitution provides similar, albeit broader, protection for the accused. See State v. Crump, 834 S.W.2d 265, 268 (Tenn. 1992), cert. denied, ___ U.S. ___, 113 S.Ct. 298, 121 L. Ed. 2d 221(1992) (Art. I, § 9, is broader and more protective of individual rights than is the Fifth Amendment to the U.S. Constitution). In this case, the appellant contends that he did invoke his right to counsel when he stated that perhaps he needed to speak

18

with a lawyer. Although one (1) government witness contended that at no time did the appellant invoke his right to counsel, Robert Boyd did admit that the appellant may have made a statement to the effect that perhaps he needed to speak with a lawyer. Under the standard announced in State v. Stephenson, 878 S.W.2d 530, 548 (Tenn. 1994), where during custodial interrogation an accused makes an equivocal request for counsel, any further questioning of the accused must be limited to those questions which will serve to clarify the accused's request for counsel. See also State v. Furlough, 797 S.W.2d 631, 639 (Tenn. Crim. App. 1990).

Whether the appellant did or did not make an equivocal or unequivocal request for an attorney is a question of fact. On the crucial issue of whether the appellant invoked his right to counsel sometime during the government's questioning of him, the trial court made no factual findings. Because the facts are in dispute, we cannot make a determination of whether the appellant's right to counsel during questioning was violated. Given the fact that the statement contained the appellant's admission that he shot and killed the victim, we cannot say that if the statement was taken in violation of his right to counsel, the admission of the statement was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967); see also State v. Brewer, 640 S.W.2d 33 (Tenn. Crim. App. 1982); T.R.A.P. 36 (b). Accordingly, we remand this case back to the trial court for a finding on the issue of whether the appellant made a request, equivocal or not, for counsel during questioning prior to confessing to the murder.

## "STATE OF MIND" HEARSAY

Lastly, the appellant contends that the trial court erroneously admitted certain statements allegedly made by the decedent to two of the State's witnesses. The appellant argues that such testimony called for inadmissible hearsay, was irrelevant, and violated his state and federal rights to confront and cross-examine witnesses.

The State contends that the statements were admissible pursuant to the longstanding exception to the hearsay rule, commonly referred to as the "state of mind" exception. See Tenn. R. Evid. 803.3.

One of the State's witnesses, Steve Pleasant, testified that on the day of the murder the decedent told him that he and the appellant were going to a barn to steal marijuana. The other State witness, Doug Martin, was allowed to testify that the decedent told him that he, the decedent, and the appellant had plans to steal marijuana. Martin also testified that the decedent told him that the plan was the appellant's idea.

When analyzed, the testimony of Pleasant and Martin attribute to the victim three out of court assertions of fact: 1) that Christopher Boyd, the victim, intended to steal marijuana; 2) that the victim intended to steal marijuana with the appellant; and 3) that the plan to steal marijuana was the appellant's. Looking at each assertion individually, we conclude that all three are hearsay and none of the statements were admissible.

First, while clearly evidencing the victim's state of mind prior to his death, the assertion that the victim intended to steal marijuana was inadmissible because it was irrelevant. We have thoroughly reviewed the record in this case, and considered all theories presented by both the appellant and the State. The identity of the victim and his whereabouts prior to his death were clearly not an issue at trial. The appellant raised no defense, such as accident, suicide of the victim, or self-defense, which would make the victim's state of mind relevant to the issue of whether the appellant murdered the victim. The appellant's sole defense at trial was that he did not kill Christopher Boyd. Thus, we conclude that this statement was irrelevant and it was error to allow its introduction. See Tenn. R. Evid. 401.

Second, although the State argues that the assertion that the victim was planning to steal marijuana with the appellant was offered to show the victim's state of

20

mind prior to his death, it is apparent to the Court that the true purpose of eliciting this testimony from Martin and Pleasant was to give evidence of the appellant's conduct in luring the victim to a remote area of the county under the guise of stealing marijuana with the real purpose of the trip being the execution of the victim.

The  Advisory Commission Comment to Rule 803.3 states that the state of mind exception to the hearsay rule "contemplates that only the declarant's conduct, not some third party's conduct, is provable by this hearsay exception." See also State v. Hutchison, 898 S.W.2d 161, 171 (Tenn. 1994).   We hold that the statements indicating the victim's plan to steal marijuana with the appellant were inadmissible hearsay because they demonstrate not only the victim's state of mind, which was immaterial,  but the appellant's conduct as well.

Other jurisdictions faced with similar cases have concluded as we do today. In Clark v. United States, 412 A.2d 21 (D. C. App. 1980), the District of Columbia Court of Appeals held inadmissible the out-of-court statements of a murder victim which evidenced her plan to meet with the accused at the location where her murdered body was later found.  That court was persuaded, as are we, by Justice Traynor's dissenting opinion in People v. Alcalde, 148 P.2d 627, 633 (Cal. 1944),  in which he wrote that such evidence,

> ...could not be admitted without the risk that the jury would conclude that it tended to prove the acts of the defendant as well as of the declarant, and it is clear that the prosecution used the declaration to that end.  There is no dispute as to the identity of the deceased or as to where she was at the time of her death.  Since the evidence is overwhelming as to who the deceased was and where she was when she met her death, no legitimate purpose could be served by admitting her declarations of what she intended to do.... The only purpose that could be served by admitting such declarations would be to induce the belief that the defendant went out with the deceased, took her to the scene of the crime and there murdered her.  Her declarations cannot be admitted for that purpose without setting aside the rule against hearsay.

21

We agree with the court in Clark that "to admit such evidence where the victim's intentions are irrelevant violates one of the fundamental concepts of the state-of-mind exception: that the declarant's own state of mind be relevant to a material issue in the case." Clark at 30; see also In Re Cheryl H., 200 Cal. Rptr. 789, 802 (Cal. App.2d Dist.1984).

Finally, the State also insists that the victim's statement that it was the appellant's plan to steal the marijuana likewise was properly admitted to show the victim's state of mind relative to his relationship with the appellant. We disagree. That the idea to steal the marijuana was the appellant's, does not shed any light on the victim's state of mind prior to his death. It is clear to this Court that the State's real purpose in seeking to introduce the statement was to bolster the State's theory that the appellant lured the victim to a remote area of the county in order to kill him. In short, the State used this testimony to show that the killing was premeditated. We conclude that the statement was inadmissible hearsay and that it was error for the trial court to allow the State to elicit this statement from Doug Martin.

In this case, because the victim's state of mind was irrelevant to the issues presented at trial, and because a portion of the statements attributable to the victim concerned the future conduct of a third party, it was error to allow the jury to hear the victim's purported statements evidencing a plan which he and the appellant had to steal marijuana together. However, if the trial court on remand determines that the appellant's confession was properly admitted at the trial, then we hold that the trial court's erroneous admission of the hearsay testimony regarding the decedent's statements to Pleasant and Martin was harmless beyond a reasonable doubt, because, in our view, the evidence of the appellant's guilt would simply be overwhelming. Tenn. Rule App. P. 36(b). Likewise, if the appellant's statement was taken in violation of his Miranda rights, and the proof at the new trial is substantially the same, such hearsay must be excluded.

22

**CONCLUSION**

The record before this court is inadequate for us to determine whether the appellant's statement was introduced in violation of his constitutional rights to an attorney. Therefore, we vacate the judgment of conviction and remand this case to the trial court for a determination of whether the appellant made a request for counsel during the custodial interrogation. If the trial court finds that the appellant did make even an equivocal request for an attorney, then the trial court shall order a new trial based upon the erroneous admission of the statement at the first trial. If, however, the trial court finds that no request for an attorney was made, the judgment of conviction shall be reinstated by the trial court.

Accordingly, this case is remanded to the trial court for further proceedings consistent with this opinion.

_____
                                                    WILLIAM M. BARKER, JUDGE


CONCUR BY:



_____
PAUL G. SUMMERS, JUDGE



_____
JOSEPH M. TIPTON, JUDGE

23