IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 25, 2005

## STATE OF TENNESSEE v. CARRIE ANN BREWSTER
## and WILLIAM JUSTIN BREWSTER

Appeal from the Criminal Court for Knox County
Nos. 75681 and 75684     Mary Beth Leibowitz, Judge

---

No. E2004-00533-CCA-R3-CD Filed April 5, 2005

---

The defendants, Carrie Ann Brewster and William Justin Brewster, appeal from their Knox County Criminal Court jury convictions of first degree felony murder, facilitation of first degree premeditated murder, especially aggravated robbery, and especially aggravated burglary. On appeal, the defendants claim that the convicting evidence was insufficient to support the convictions and that the trial court erred in denying the defendants' motions to suppress their pretrial confessions. Because the record supports the convictions and the trial court's ruling on the pretrial motions to suppress, we affirm; however, we modify the especially aggravated burglary conviction to one of aggravated burglary.

**Tenn. R. App. P. 3; Judgments of the Criminal Court are Affirmed, as Modified.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which GARY R. WADE, P.J., and NORMA MCGEE OGLE, J., joined.

Russell T. Greene, Knoxville, Tennessee, for the Appellant, Carrie Ann Brewster; and Bruce E. Poston, Knoxville, Tennessee, for the Appellant, William Justin Brewster.

Paul G. Summers, Attorney General & Reporter; J. Ross Dyer, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

At approximately ten o'clock on the evening of June 19, 2002, Michael Atteberry heard two gunshots at the residence of his neighbor, Bobby David Ervin, the victim. Mr. Atteberry saw a slender Caucasian male run out of the victim's house to a red Nissan truck, and a few seconds later, Mr. Atteberry heard three more gunshots. Then, a second person, Caucasian and heavier in build than the first person, ran from the house to the truck. The truck left with dispatch but not hastily. Mr. Atteberry called the police.

When police officers arrived, they found the body of the victim in a recliner chair in the living room. The victim had been beaten with a blunt object, stabbed numerous times with a sharp object, and shot three times with a .357 gun.

The officers found approximately $13,000 in cash in the victim's pants pockets. Behind the recliner, they found two handguns and a large quantity of marijuana and cocaine. The house was unkempt and in disarray; at trial, the parties differed about whether the house had been ransacked. The defendants maintained that the disarray was merely the result of the victim's customary untidiness. A blood smudge was found inside a dresser drawer in the master bedroom, and the locked door to a second bedroom had been kicked in by someone wearing shoes that apparently had tracked through the blood in the living room.

The officers' investigation caused them to look for the husband-and-wife defendants, Carrie Ann Brewster and William Justin Brewster.[1] A detective left his number with JB's mother. Several hours later, a weeping CB called the detective and said, "You're not going to believe me; you're not going to believe me that I killed that man in self-defense." The detective suggested that CB and JB come to the police station.

The defendants arrived at the station in their automobile. The officers interviewed them separately, beginning with CB. She signed a written waiver of her *Miranda* rights and gave a tape-recorded statement in which she stated that she and JB had killed the victim. Likewise, after also waiving his *Miranda* rights, JB confessed that he and CB had killed the victim.[2] He admitted that he took $150, a handgun, and some pills from the victim's home. The defendants told the officers that they could find the handgun used in the homicide beneath the front seat in the defendants' car. The officers retrieved the .357 revolver, which through forensic analysis proved to be the gun that fired bullets into the victim's neck, chest, and arm. In his pretrial statement, JB admitted that he had obtained the revolver from the rear bedroom in the victim's house.

Based upon the foregoing evidence, the jury convicted each defendant of felony first degree murder, facilitation of first degree premeditated murder, especially aggravated robbery, and especially aggravated burglary. The trial court merged each verdict of guilty of facilitation of first degree premeditated murder with the respective verdict of first degree felony murder. Each defendant received a life sentence for the felony murder conviction and 25-year and 12-year Department of Correction sentences, respectively, for the especially aggravated robbery and especially aggravated burglary convictions.

---

[1] To facilitate distinguishing between the defendants in this opinion, we will refer to William Justin Brewster as "JB" and to Carrie Ann Brewster as "CB."

[2] Before trial, the defendants requested a joint trial, and each defendant executed a waiver of the right-to-confrontation interests protected by *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620 (1968). The trial court conducted an intensive, thorough *voir dire* of each defendant and determined that each waiver was competently and voluntarily made.

On appeal, each defendant challenges the sufficiency of the convicting evidence and the trial court's failure to suppress that defendant's pretrial statement.

## I. Sufficiency of the Evidence.

When a defendant challenges the sufficiency of the evidence on appeal, the relevant question for the reviewing court is whether, after viewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Great weight is accorded the result reached by the jury in a criminal trial; a guilty verdict accredits the state's witnesses and resolves all factual conflicts in favor of the state. *State v. Shropshire*, 45 S.W.3d 64, 70 (Tenn. Crim. App. 2000). On appeal from a verdict of guilty, the state is entitled to the strongest legitimate view of the evidence and to all reasonable inferences which may be drawn from the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). The guilty verdict removes the presumption of innocence which the appellant enjoyed at trial and replaces it with a presumption of guilt on appeal, and the defendant, as the appellant, has the burden of overcoming this presumption of guilt. *Shropshire*, 45 S.W.3d at 70.

A person commits felony murder who kills another in the perpetration or attempt to perpetrate, *inter alia*, any robbery or burglary. Tenn. Code Ann. § 39-13-202(a)(2) (2003). A person commits premeditated first degree murder who kills another premeditatedly and intentionally. *Id.* § 39-13-202(a)(1).

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

*Id.* § 39-13-202(d). "A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under [section] 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." *Id.* § 39-11-403(a). Facilitation of premeditated first degree murder is a lesser included offense of premeditated first degree murder. *State v. Burns*, 6 S.W.3d 453, 470 (Tenn. 1999).

A person commits especially aggravated robbery who knowingly or intentionally steals property from the person of another by violence or by putting the person in fear, *id.* § 39-13-401(a), a deadly weapon is used to accomplish the robbery, *id.* § 39-13-403(a)(1), and the victim suffers serious bodily injury, *id.* § 39-13-403(a)(2).

A person commits especially aggravated burglary who, without the effective consent of the owner, enters a building "not open to the public with intent to commit a felony, theft or assault," *id.* § 39-14-402(a)(1), and the victim suffers serious bodily injury, *id.* § 39-14-404(a).

In the light most favorable to the state, the evidence in the present case shows that, with CB's assistance, JB entered the victim's home without his consent for the purpose of robbing him. JB's pretrial statement reveals that he knew that the victim kept a large wad of money and a cache of drugs in the locked back bedroom, which JB entered by kicking down the door during the victim's assault. The victim clearly suffered serious bodily injury as a result of the beating, stabbing, and shooting inflicted by the defendants. Therefore, the evidence supports a verdict of guilty of especially aggravated burglary for both defendants.

Once both defendants were inside the house, the two of them assaulted the victim with multiple deadly weapons. JB beat the victim with a baseball bat, and CB beat him with a hammer. Apparently, at some point CB stabbed the victim with a knife, and after JB retrieved the victim's .357 handgun from the back bedroom, CB shot the victim three times. The victim died from his injuries. The defendants took about $150 in cash, some pills, and the handgun from the victim's house. Accordingly, the evidence supports the convictions of especially aggravated robbery.

Because the defendants killed the victim during their perpetration of a burglary and a robbery, the evidence supports the defendants' convictions of felony murder.

Also, we conclude that the evidence supports the guilty verdicts of facilitation of premeditated first degree murder. The totality of assaults committed against the victim were accomplished cooperatively by two people using at least four deadly weapons and, apparently, requiring an extended period of time to complete. The medical examiner opined that due to the various brain hemorrhages caused by the blows to the victim's head there existed a "great possibility" that he would have died from the "secondary brain edema" resulting from these blows, had his life not been extinguished preemptively by the gunshot wound through the chest. Nevertheless, after the initial assaults with the bat, hammer, and knife, JB broke into the rear bedroom, found the handgun, gave it to CB, and CB then shot the victim three times. Two of the shots were fired at a very close range. We have no trouble discerning that at least the gunshots were inflicted premeditatedly. Also, because the victim's defensive efforts were overcome by the combined efforts of the armed defendants, the jury had a basis for concluding that both of them furnished substantial assistance in the commission of first degree murder.[3] Moreover, this court has recognized that when "the evidence was sufficient to support conviction for the greater offense charged, the defendant cannot complain of the jury finding him guilty of the lesser offense." *McDonald v. State*, 512 S.W.2d 636, 640 (Tenn. Crim. App. 1974).

Therefore, we conclude that the evidence supports each and every conviction of both defendants.

---

[3]The medical examiner opined that the blunt trauma to the victim's head would have caused unconsciousness.

-4-

## II.  Suppression of Statements.

The defendants moved the trial court to suppress the inculpatory statements they separately gave to Knoxville Police Department Major Crimes Detective A.J. Loeffler.  Each defendant claims that the statement was made unknowingly and involuntarily.  The trial court conducted a pretrial evidentiary hearing. Detective Loeffler testified that CB called him and tearfully admitted that she had killed the victim in self-defense.  Detective Loeffler asked that CB and JB come to the police station.

When they arrived, Detective Loeffler and another officer interviewed them separately.  Detective Loeffler testified that CB was distraught and crying.  He testified that he read to CB the litany of *Miranda* rights and that she waived them in writing.  He testified that, although she was upset, CB did not appear to be under the influence of any alcohol or drugs and was intelligent and responsive.  He testified that he did not force or coerce her to give a statement and made no promises in exchange for a statement.  In particular, he denied that CB requested an attorney.  He agreed that he told CB that she should think of her children when assessing whether to tell the truth about the homicide.

Detective Loeffler testified that, when JB came into the interview room, he seemed "groggy" and "thick-tongued."  The detective concluded, however, that although JB had admitted taking Xanax several hours earlier, he was mentally aware and responsive.  Detective Loeffler testified that he read the *Miranda* litany to JB, that JB signed a written waiver, and that JB appeared to understand the questions and did not "doze off."  The detective testified that although JB was upset and cried, he was not coerced in any way.

CB testified at the suppression hearing that when she called the police station to reach Detective Loeffler, a female at the station told her over the phone that the defendants "had an hour to get [themselves] up here or – something to the effect that your kids are gone.  Or you'll lose your kids."  CB testified that she panicked at this threat, and she started driving herself and JB to Knoxville from their mobile home in Dandridge.  She testified that during the trip, JB ingested hydrocodone and Valium pills from a bottle.  She testified that she wished to have an attorney present, and when they arrived at the police station, she asked Detective Loeffler how long it would take to get any attorney there.  When he responded that it would take 72 hours, she and JB agreed to be interviewed without an attorney.  She admitted that, during the interview, the detective asked her if she wanted an attorney, and she responded, "No."

She testified that she had never before been arrested and was unfamiliar with police procedures.  She stated that Detective Loeffler facilitated her making inculpating statements by denigrating the victim, affirming the victim's history of drug dealing and violence, and expressing empathy for the defendants' feeling threatened by the victim and the victim's family.  She admitted in the suppression hearing that some of her pretrial statement was untrue.

She testified that during the interview, she felt she was not free to leave. She was not told that she could leave, the door to the room was closed, and the officers had declined at one point to let her go out to smoke a cigarette.

CB testified in the hearing that on the night the statements were given, JB, who was a "pill head," was "too out of it" to give a statement.

JB did not testify at the suppression hearing. He submitted exemplars of his signature which, he maintained, varied significantly in clarity from his signature on the *Miranda* waiver form.

The trial court denied both motions to suppress. The judge commented that the defendants both came into the police station voluntarily "for whatever reasons brought them in." She observed, "[CB] may have come in out of fear that her children might be taken away[,] but she came in to deal with the issue and did it voluntarily." The trial judge discerned nothing wrong with the interrogation and characterized it as free of badgering and coercion. Although the judge agreed with Detective Loeffler after listening to the tape of JB's statement that JB's voice sounded "somewhat slurred," she had never heard JB's normal voice. She did compare his waiver signature with the signature exemplars but found the latter to be only "a little different from the waiver." The judge stated that the record failed to articulate what kind of, or how many, pills JB had taken. The court found that, despite JB's slurred speech, "it is clear that . . . he understood [the] questions[,] . . . that he answered those questions and . . . he clarified many times." Significantly, the judge thought, JB was able to repeat the faux explanation for the homicide that CB had "made up." In sum, the judge determined that JB made "a free, knowing, voluntary and understood statement."

At an evidentiary hearing, the state has the burden of demonstrating by a preponderance of the evidence that the defendants' statements were voluntary, knowing and intelligent. *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980). A trial court's determination at a suppression hearing is presumptively correct on appeal, *State v. Stephenson*, 878 S.W.2d 530, 544 (Tenn. 1994), and the findings are binding upon this court unless the evidence contained in the record preponderates against them, *State v. Odom*, 928 S.W.2d 18, 22 (Tenn. 1996); *Stephenson*, 878 S.W.2d at 544; *State v. Aucoin*, 756 S.W.2d 705, 710 (Tenn. Crim. App. 1988).

Under this standard, matters regarding the credibility of witnesses, the weight and value to be afforded the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial court. *Odom*, 928 S.W.2d at 23. Thus, on appeal, the defendant has the burden of showing that the evidence preponderates against a finding that a confession was, in fact, knowingly and voluntarily given. *State v. Buck*, 670 S.W.2d 600, 610 (Tenn. 1984). In determining whether a statement is made voluntarily, this court must look to the totality of the circumstances surrounding the confession, and the standard is whether "the behavior of the state's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined." *Kelly*, 603 S.W.2d at 728.

The Fifth Amendment right to counsel attaches during custodial interrogation. *Edwards v. Arizona*, 451 U.S. 477, 481-82, 101 S. Ct. 1880, 1883-84 (1981). If a defendant requests counsel while being given his *Miranda* warnings or during custodial interrogation, the interrogation must cease. *Id.* at 482, 101 S. Ct. at 1883; *Miranda v. Arizona*, 384 U.S. 436, 444-45, 86 S. Ct. 1602, 1612 (1966); *State v. Huddleston*, 924 S.W.2d 666, 669 (Tenn. 1996). In that situation, any subsequent statement made by a defendant as a result of police-initiated interrogation must be suppressed. *Edwards*, 451 U.S. at 477, 101 S. Ct. at 1880.

The United States Supreme Court has held that an accused must articulate his desire to have counsel present unambiguously and with sufficient clarity so that a reasonable police officer under those specific circumstances would understand the statement to be a request for counsel. *See Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 2355 (1994); *Huddleston*, 924 S.W.2d at 669. If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning. *Davis*, 512 U.S. at 460, 114 S. Ct. at 2356. An equivocal or ambiguous request for counsel does not trigger the *Edwards* requirement under the Fifth Amendment. *Id.* at 452, 114 S. Ct. at 2350; *Huddleston*, 924 S.W.2d at 669-70. In other words, "[u]nless the suspect actually requests an attorney, questioning may continue." *Davis*, 512 U.S. at 462, 114 S. Ct. at 2357. To unequivocally invoke one's right to counsel, the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable officer would understand the statement to be a request for an attorney." *Huddleston*, 924 S.W.2d at 670.

The determination whether the appellant made a request for an attorney, equivocal or unequivocal, is a question of fact for the trial court to determine. *State v. Farmer*, 927 S.W.2d 582, 594 (Tenn. Crim. App. 1996).

In the present case, the evidence does not preponderate against the trial court's findings of fact that resulted in a denial of the motions to suppress. The defendants' waivers and their tape-recorded statements support the trial court's findings that the defendants acted voluntarily and free of coercion when they essentially confessed to killing the victim and asporting with some of his property. The trial court did not accredit CB's suppression-hearing testimony that her will to remain silent was overborne by a threat to take her children from her and/or by the rigors of custodial interrogation. Although CB cried at times during the interview, the tenor of her answers to questions and her spontaneous narration of events attested to purposeful awareness and voluntariness in her conversation with Detective Loeffler. Although the trial court did not make a specific finding about whether CB requested an attorney, its rejection of this claim is implicit when Detective Loeffler affirmatively testified that no such request was made, and the judge was clearly impressed with the detective's professionalism and credibility. We conclude that the trial court accredited the detective's statement that no request for an attorney was made.

As noted by the trial judge, JB's voice in the tape-recorded interview sounds slurred. However, as also noted by the trial judge, the record contains no basis for a court's determining whether the defendant's voice on the tape is substantially different from his normal speaking voice. JB did not testify in the suppression hearing, and we are at a loss to discern in the record that he was

drug-impaired or otherwise limited at the time he signed the *Miranda* waiver and gave the approximately two-hour long statement. JB's replies to the detectives' questions were generally responsive, meaningful, and lucid. All in all, the record supports the trial court's determination that JB gave a knowing and voluntary statement.

### III. Statutory Bar to Especially Aggravated Burglary Conviction.

As a matter of plain error, *see* Tenn. R. App. P. 13(b), we notice that Tennessee Code Annotated section 30-14-404(d) prohibits prosecution of acts of especially aggravated burglary *both* as especially aggravated burglary and as some other offense, such as the especially aggravated robbery in the present case. *Id*. § 39-14-404(d) (2003); *see State v. James Ruben Conyers*, No. M2002-01007-CCA-R3-CD (Tenn. Crim. App., Nashville, Sept. 5, 2002). As a result, the defendant's conviction of especially aggravated burglary must be reduced to aggravated burglary. We impose that conviction and a Class C, Range I sentence of six years.

### IV. Conclusion.

We affirm the judgments of the trial court, except that we modify the conviction of especially aggravated burglary to aggravated burglary, for which we impose a sentence of six years.

_____
JAMES CURWOOD WITT, JR., JUDGE