IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT JACKSON

OCTOBER 1999 SESSION

**FILED**

**March 7, 2000**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**



| | | |
|---|---|---|
| STATE OF TENNESSEE, | * | C.C.A. No. W1999-02000-CCA-R3-CD |
| Appellee, | * | Haywood County |
| vs. | * | Honorable Julian P. Guinn, Judge |
| MICHAEL THOMASON, | * | (Aggravated Sexual Battery, Sexual Battery, Contributing to the Delinquency of a Minor) |
| Appellant. | * | |

FOR THE APPELLANT:

Dwayne D. Maddox, III
D. D. Maddox
Maddox, Maddox & Maddox
19695 East Main Street
P. O. Box 827
Huntingdon, TN  38344-0827

James S. Haywood, Jr.
28 South Washington
P. O. Box 438
Brownsville, TN  38012

FOR THE APPELLEE:

Paul G. Summers
Attorney General & Reporter

Patricia C. Kussmann
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN  37243-0493

Clayburn L. Peeples
District Attorney General

Shannon Poindexter
Assistant District Attorney General
110 South College Street, Suite 200
Trenton, TN  38382-1841

OPINION FILED: _____

AFFIRMED IN PART, REVERSED AND REMANDED IN PART,
AND REVERSED AND DISMISSED IN PART

ALAN E. GLENN, JUDGE

# O P I N I O N

The defendant, Michael Thomason, appeals as of right his conviction by a Haywood County Circuit Court jury of four counts of sexual battery, one count of aggravated sexual battery, and one count of contributing to the delinquency of a minor. The trial court sentenced the defendant as a Range I standard offender to two years on each of the sexual battery charges; ten years on the aggravated sexual battery charge; and eleven months and twenty-nine days on the misdemeanor count of contributing to the delinquency of a minor, the sentences to be served concurrently. The defendant presents the following issues for review:

    I.    Whether he was deprived a fair and impartial trial because of errors of the trial court including:

        (a)    Failure to grant the defendant's request for a bill of particulars;

        (b)    Failure to require the State to elect offenses for the various victims;

        (c)    Failure to hold a jury-out hearing regarding testimony of other bad acts according to Rule 404(b), Tennessee Rules of Evidence, and allowing testimony as to such acts;

        (d)    Allowing admission of prior inconsistent testimony by one of the victims; and

        (e)    Reinstatement of Count 11 of the indictment after it had been severed.

    II.    Whether there was prosecutorial misconduct in handling the appearance of a ten-year-old victim-witness and in providing information to the victims regarding possible compensation;

    III.    Whether the trial court erred in refusing to instruct the jury as to possible penalties; and

    IV.    Whether the special verdict form submitted to the jury and the charge as to its meaning were incomprehensible.

Based upon our review, we affirm the convictions in Count 2 (sexual battery) and Count 11 (aggravated sexual battery), reverse and dismiss the conviction in Count 15 (contributing to the delinquency of a minor), and reverse and remand for a new trial the convictions in Counts 9 (sexual battery), 13 (sexual battery), and 14 (sexual battery).

## PROCEDURAL BACKGROUND

The indictment of fifteen counts against the defendant consisted of the following:

2

Count I:    rape of KF[1]

**Count 2:   sexual battery of KF**

**Count 3:   contributing to the delinquency of minor KF**

**Count 4:   rape of KF**

**Count 5:   rape of KF**

**Count 6:   rape of BC**

**Count 7:   rape of BC**

**Count 8:   contributing to the delinquency of minor BC**

**Count 9:   sexual battery of BC**

**Count 10:        contributing to the delinquency of minor BC**

**Count 11:        aggravated sexual battery of TH**

**Count 12:        aggravated sexual battery of TH**

**Count 13:        sexual battery of JC**

**Count 14:        sexual battery of JC**

**Count 15:        contributing to the delinquency of minor JC.**


**Counts 3, 8, 10, and 12 were dismissed prior to the trial at the request of the State. The defendant was found not guilty of Counts 1, 4, 5, 6, and 7. Defendant was found guilty of Counts 2, 9, 11, 13, 14, and 15.**

**FACTS**

At the time of his trial on June 30, 1998, the defendant was a forty-six-year-old, self-employed carpet installer who lived with his ex-wife and their three children on Tom Owen Road in Brownsville. The defendant also owned a "camphouse" on River Bend Road on the Hatchie River in Haywood County. The camphouse was a trailer on the banks of the river. The defendant, his daughter, and her friends spent a great deal of time there.

As part of the State's proof, each of the four victims testified. The first to testify was TH, a ten-year-old at the time of trial. TH was named as the victim in Count 11, in which the defendant was convicted of aggravated sexual battery and sentenced to ten years, and in Count 12, which was dismissed prior to the trial. TH testified that she knew the defendant because he was her next-door neighbor and a friend of her parents. She spent weekends at the camphouse with the defendant and without her parents. She testified to

---

[1] This court's policy is to refer to minor victims of sexual abuse by their initials rather than their names.

an incident that occurred on an unspecified weekend, when she could only recall that it was "real cold." The defendant took all her clothes off and put her in a tanning bed located in one of the bedrooms at the camphouse. He was in the room with her and was unclothed. She testified that the defendant "started feeling of me," touching her on her vagina.

On cross-examination, TH testified that the defendant's son, who was about her age, and the defendant's teenage daughter also went to the camphouse. They would watch movies and fish. When asked about the stuffed animal she was holding while testifying, TH stated that it was a Beanie Baby that her mother bought for her in a shop across the street from the courthouse.

JC, age eighteen at the time of trial and the second victim to testify, said she had known the defendant for about two years. JC met the defendant through his daughter. The two girls attended the same high school. At the time they met, JC was living with her aunt and uncle in Stanton, Tennessee. She was not getting along with her uncle, so the defendant suggested that she move into the house where he lived with his ex-wife and children. JC testified that the defendant was like a father to her. Soon after she began testifying, it became apparent that her testimony at the trial was different from that at the preliminary hearing:

> A. When he would hug me, it would - - it didn't mean anything like he wanted me in a different way, or when something happened it wasn't meant how I thought it was - - it happened. He never touched me in my female body parts.
>
> Q. Now, that's different from what you said at the Preliminary Hearing, isn't it?
>
> A. Yes.

At this point, the prosecutor was allowed to treat JC as a hostile witness.

JC testified that she moved in with the defendant in November 1996, and about three weeks later, he began touching her inappropriately. The following exchange took place between JC and the prosecutor:

> Q. And what's the first incident you talked about him doing - - the first thing that he did that was not appropriate?
>
> A. When I'd come home and when I was sitting on the couch and he was just playing around with me. He'd put his - - he was rubbing his hand on my leg and I took it in a different way because that's when everybody was spreading rumors

4

that he was doing this and that to other girls.

Q. What part of your leg did he touch - - did he put his hand on?

A. The inner side of my leg.

Q. The inside of your leg. How far above your knee?

A. Maybe a few inches.

Q. A few inches above your knee. And you took that to be inappropriate at the time?

A. He - - every parent wrestles with their kids.

She also testified as to another incident that occurred about three weeks after she had moved in with the defendant:

Q. You did say - - you did tell the General Sessions Judge, though, that he put his hands inside your panties?

A. I said inside my pants.

Q. You said what?

A. Inside of my pants.

Q. I believe you were asked the question, "Inside your clothing?" by Ms. Poindexter, and you said, "Yes, ma'am." Then she said, "Inside your panties?" and you said, "Yes, ma'am." I believe you said that you backed away from him then to get away from that. Is that correct?

A. He had been drinking and I didn't know if he was playing or if he meant it, so I just left the room.

Q. Okay. Now, I believe you also said that every time he would walk by he would either hug or touch you. Did you say that?

A. Yes.

Q. Is that the way he would do?

A. He - - he did me and [CT] like that. It was always - -

Q. [CT], his daughter, or [KF]?

A. His daughter.

JC then testified about a third incident:

Q. Okay. And I believe you told about another incident when you had been - - or when you were alone with him at the camphouse. Do you remember telling about that incident?

A. The one on the couch?

Q. When - - right. When he would - - you - - I

5

believe you said he had been drinking.

A.    Yes.

Q.    How much had he been drinking?  Do you know?

A.    No.  I had been at work.

. . . .

Q.    Now, back to the couch.  What did he do to you on that couch?

A.    He just touched my leg and was just rubbing on my leg and I - - I took it in a different way because we had been arguing.  We hadn't been - - we weren't getting along, and that's when the girls started spreading that he was touching them and messing with them and sleeping with them and - -

Q.    Did you testify that he took you off the couch, put you on the floor and held you down while he put his hands up your shorts?

A.    Yes.  That's when he was touching my leg, and I kicked him away because I didn't know if he was playing if - - because he'd been drinking.

Q.    Did he - - did he touch you inside your panties then?

A.    No.

Q.    Do you remember saying that he did?

A.    No.  I didn't say he touched me inside of my panties.

Q.    "Question - Okay.  And you said his hand went up your shorts?"  You answered, "Yes," to that, did you not?

A.    Yes.

Q.    "Question - Did they go inside your panties?" And again, you answered, "Yes," did you not?

A.    I didn't remember.

Q.    Where exactly did he touch you?  Did you not say, "Just between my legs and on my butt"?

A.    Yes.

Q.    Now, is that what he did?

A.    That - - yes, but - -

Q.    How - - I'm sorry. Go ahead.

A.    I'm sorry.

Q.    If you want to say more, please do.  How did you get him off of you on that occasion?

A.    I kicked him off with my foot.

Q.    Now, has he explained to you why that wasn't

6



improper?

A.    We talked about it several times before I moved out.

Q.    Why did he tell you he was doing things like that to you?

A.    Because he cared about me.

On cross-examination, JC gave the following account of her background:

My mother and father really abandoned us.  They didn't want us, and we were put in Youth Services to be put in foster homes or whatever, and my aunt had taken care of me until I was five, and she wanted me, so she come to Arkansas and got me, and then I stayed with them for a while, and me and her husband just really could not get along.  So, I had moved in with Mike and [the defendant's daughter].

KF, the third victim to testify, was a seventeen-year-old who had known the defendant for about six years.  She was listed as the victim in Counts l, 2, 3, 4, and 5.  As to those five counts, the defendant was found not guilty of Counts 1, 4, and 5, all charging rape; he was convicted of Count 2, sexual battery, and sentenced to two years; and Count 3, contributing to the delinquency of a minor, was dismissed.  KF testified regarding activities at the camphouse that included smoking and drinking.  The defendant supplied the cigarettes and alcohol.  She also testified to having sexual intercourse with the defendant "maybe eight" times but could not recall specific times except one occasion about two weeks before her fifteenth birthday.  KF was always at the camphouse when these encounters with the defendant took place.  She testified that on the first occasion before her fifteenth birthday, she "kind of pushed him away.  I was trying to go, but he wouldn't quit."  She said the defendant raped her on that occasion.  KF also testified as to another incident that happened sometime in the summer, when she was fourteen or fourteen and a half, while she was helping the defendant install vinyl flooring.  On this occasion, the defendant felt of her breasts and vagina.  The defendant bought her more cigarettes and  a cellular phone as a way of being "nice" to her.

The fourth victim, BC, was sixteen at the time of trial, married, and expecting a baby.  She was alleged to be the victim in Counts 6 and 7, charging rape; Counts 8 and 10, charging contributing to the delinquency of a minor; and Count 9, charging sexual battery.  Of these five counts, the defendant was convicted only in Count 9 and sentenced to two years.  Counts 6 and 7 resulted in verdicts of not guilty, and Counts 8 and 10 were dismissed.

7

BC testified that she had known the defendant since 1994 or 1995. She was also a friend of the defendant's daughter and often babysat the defendant's young son. BC testified that she had sexual intercourse with the defendant, but it was "not willingly." She testified the defendant raped her the first time one afternoon when she was babysitting his son. She also described an incident at the camphouse that occurred in the fall after "school had started," when the defendant gave her tequila. When questioned about the defendant's giving her tequila, she testified that it was available "[a]ny time that we wanted it. All we had to do was ask for it." On this occasion, she became drunk, passed out, and regained consciousness only to find the defendant having oral sex with her. She said that she could not remember the first time he had touched her "inappropriately" because there had been "so many times." When asked why she continued to "keep hanging out with him," she replied that she "was just scared of what he might do, or if I was to tell on him nobody would believe me so I - - I didn't try to hang around Mike intentionally. I was just with [defendant's daughter] and [KF]." BC also testified to a troubled relationship with her mother who had, at one point, "pressed unruly charges" on her. The defendant told her that because of this, a judge would not believe her. Her decision to come forward with charges against the defendant was based on her feeling that she had "lived with this long enough."

At the sentencing hearing, the trial court described the proof of guilt as "quite simply stated, overwhelming." The trial court described the defendant as having an "ability to detect and draw these young girls to you. You have the ability to find troubled young pubescent girls who are either without a father, without a family or without family support."

Although the defendant did not testify in the trial, ten witnesses were called in his behalf.[2]

**Beth Estes testified that she had spoken with BC about the latter's charges against the defendant. BC told her the defendant was giving her "money and things that she needed and wanted just so she wouldn't say anything." Estes then made up a story that the defendant had "touched" her and had given her "cigarettes and things." She did not believe the "story" that BC was telling about the defendant, but she did not know whether it was true. Estes also had a conversation with JC who**

---

[2]Witnesses who were minors at the time of their testimony will be identified by their initials.

said that the allegations she had made against the defendant were not true. Upon cross-examination, Estes said that, prior to recanting her statement that the defendant had touched her breasts, the defendant had paid her a sum of money, less than $100, which she used to repay money she took from her "little nine-year old brother's fund raiser" to buy cocaine.

Tracy Burke testified that she overheard a conversation between JC and another young woman during which JC said the defendant's "old lawyer paid her – or was paying her $9,000.00 to say that [the defendant] didn't [touch her or any of the other girls].

Jerry Hendrix, who was JC's husband, although at the time of trial they were in the process of a divorce, testified that JC told him that "when all this was over and she got her money she was going to buy a vehicle." However, JC did not tell him what the source of these funds would be.

Gary Denevan testified that he was married to JC's aunt. JC had lived with them for about six months, and he heard JC say that she was going to receive money from "the State. . . [from] a fund for those testifying. . . ." He had also heard that JC had accused him of molesting her. Upon cross-examination, Denevan said that he had only heard about JC's accusation against him two days prior to the trial.

CC testified that she was acquainted with the defendant's daughter, as well as with KF, BC, TH, and JC. She had often stayed with the defendant's daughter at the defendant's house and had been to the camphouse where the victims alleged that the sexual acts had occurred. When asked if she had ever seen the defendant "do anything that was inappropriate with any of the girls or children that were down at the camphouse," she replied, "No. He . . . treated us just like he treated his own kids." During cross-examination, she testified that the day before her testimony, she had gone with the defendant to "look at GEO Trackers."

Joe Sweat testified that he had lived with KF's mother for three years and had been told that KF had accused him of molesting her. During cross-examination, he said he heard about this claim of alleged molestation from his daughter and sister, who apparently learned of it from the defendant's sister. Sweat's sister asked KF if

9

she had made this allegation, and KF told her she had not.

Donna Jo Hughes testified that she was the best friend of the defendant's younger sister. Hughes was a beautician and, while working at her beauty shop, overheard JC say

that "they wanted money" and that the defendant had not really done anything to her. Upon cross-examination, she said she had not told anyone in law enforcement about JC's statement but had told the defendant, his wife and sister, and one other person. She testified that the defendant's daughter was with JC at the beauty shop when this statement was made.

Deborah Russell testified that JC, KF, and BC came to her house to see her in October of the previous year. TH was not with them. JC told Russell they had all come over there "to discuss what we're going to say in Court against Mike." Russell thought this conversation occurred after the preliminary hearing had already been held. During cross-examination, she described her relationship with the defendant by saying, "[h]e's like a second Daddy to me. I've been around him for a long time."

CB testified that she was acquainted with the defendant's daughter, KF, BC, and JC. She was with the defendant's daughter at school when KF told them that the defendant had "never touched her." Additionally, CB testified that JC said the defendant "would never do" what KF was accusing him of.

CT, the defendant's daughter, testified that she used to be KF's best friend and she was acquainted with BC, JC, and TH. She testified as to conversations which she had with KF and JC. Apparently, KF told her that the defendant "never touched her." When CT asked KF why she was "lying" on the defendant, KF "didn't say anything." KF said that JC was a "liar" and that she was going to "whip" JC. CT testified that KF had been to the defendant's camphouse "lots of times," and had also been there alone. BC went to the camphouse on one occasion, according to CT.

During cross-examination, CT stated that the defendant treated KF "just like he treated" her. He bought cellular phones for both of them. She and KF each had their own bedrooms at the camphouse. When they went to the camphouse, CT's

10

**mother would stay home with CT's two brothers, or, if she came, she would not spend the night. CT did not know if the parents of any of the victims had confronted her mother regarding the molestation claims against the defendant.**

**As a rebuttal witness, an attorney who had previously represented the defendant denied that he had offered any witness "money in order to either testify or not testify in this case."**

ANALYSIS

I. Fair and Impartial Trial

A. Bill of Particulars

The defendant, charged in fifteen counts involving sexual activity with four minor girls committed at various unspecified dates over a period of forty-one months from January 1, 1994, through May 1, 1997, filed a pretrial motion according to Tennessee Rule of Criminal Procedure 7(c) seeking a bill of particulars. The defendant sought particular information "so as to adequately identify the offenses with which he is charged in the indictment in this cause and especially with respect to dates, places, times, and particular circumstances upon which the State will rely to establish the corpus delicti and the guilt of the defendant." At the argument on the defendant's motion for a bill of particulars, the district attorney stated:

> Your Honor, the State agrees to all of the Discovery Motions in the case. We have complied to the extent that we can. With regard to the Bill of Particulars, we have told them everything we know which does not include specific dates because we do not know specific dates, but we have provided all of the information that is available to us and we have provided locations, so to that extent we agree that the Order for Discovery should be signed.

> We have also provided them with copies of statements made by witnesses. There is a statement that was taken from the defendant's daughter who is not a witness or we do not anticipate using that statement. We don't have a copy of that statement. The Department of Human Services has it. We don't have an objection to them having a copy of it, but the Court will have to order that be done.

At a later pretrial hearing, the defendant again argued for a bill of particulars, saying that "[w]e don't have specific dates which limits us as far as preparing our defense in the case." The State responded:

> We have, in fact, given them what amounts to as much of a Bill of Particulars as we can in our discovery response. It does not state specific dates, but I would argue to the Court that that is almost always the case when we are dealing in cases of child sexual abuse. It is seldom that the State is ever able to say with specificity on what dates abuse occurred[.]

The trial court overruled the motion, concluding that because there was a preliminary hearing there was no need for the State to provide a bill of particulars to the defendant. The defendant argues that the preliminary hearing was not a substitute for a bill of particulars and could not supply the information that is required for the defendant to be properly prepared to defend the case.

Tennessee Rule of Criminal Procedure 7(c) provides that, "upon motion of the defendant, the court may direct the filing of a bill of particulars so as to adequately identify the offense charged." The issuance of a bill of particulars, therefore, lies in the discretion of the trial court. Appellate courts give considerable leeway to the trial court when reviewing the exercise of this discretionary authority. The purpose of a bill of particulars is to provide the defendant with enough information about the charge to prepare a defense, to avoid prosecutorial surprise at trial, and to preserve a plea of double jeopardy. See State v. Campbell, 904 S.W.2d 608, 611 (Tenn. Crim. App. 1995). If the requested information is in the indictment[3] **or has been provided by the State in some other satisfactory form, a bill of particulars is not required. See State v. Hicks, 666 S.W.2d 54, 56 (Tenn. 1984) (quoting favorably 1 C. Wright, Federal Practice and Procedure, Criminal, § 129 (1982) at 434).**

**Although the indictment in this case was not specific as to dates for the offenses, the law in Tennessee is well established that the exact date of an offense need not be stated in the indictment unless the date is "a material ingredient in the offense." Tenn. Code Ann. § 40-13-207 (1997). Our supreme court has noted that, in many cases of child sexual abuse, "the state will be unable to offer specific dates on which the alleged offenses occurred." State v. Byrd, 820 S.W.2d 739, 741 (Tenn. 1991). Where the State is unable to give even an approximate time by means such as reference to another event, a conviction may be affirmed "if in the course of the trial it does not appear that the defendant's defense has been hampered by the lack of specificity." Id. at 742; see also State v. Ealey, 959 S.W.2d 605, 609 (Tenn. Crim. App. 1997) (finding that in cases of child sexual abuse where the State is unable to provide even approximate time or date, a conviction may nevertheless be affirmed if the defendant is unable to show that he was prejudiced by the lack of specific dates of the offenses) (quoting State v. Speck, 944 S.W.2d 598, 600 (Tenn. 1997)).**

_____

[3] The record shows that three charges were dismissed as time-barred and one as duplicative.

**The State provided the defendant with what information it had. Additionally, the defendant was represented by prior counsel at the preliminary hearing, and his trial counsel utilized a transcript from that proceeding to cross-examine trial witnesses.**

**Although defense counsel argued the difficulty of using alibi testimony, the defendant did not testify, and this was never a proffered defense. There is no indication from the trial record that the defendant was anything less than completely prepared to mount a vigorous defense or that he would have done anything differently could a bill of particulars have been provided. There is no proof of prosecutorial surprise. This issue is without merit.**

### B. Election of Offenses and Specificity of Allegations

The defendant next agues that the trial court erred in failing to grant a judgment of acquittal on each of the counts, especially those involving JC, which included the charge of contributing to the delinquency of a minor. The defendant presses this as an "election of offenses" problem, arguing there was no proof that he gave JC any cigarettes or alcohol, or that the sexual batteries took place. The defendant further argues as to the other three victims, that "[t]here is absolutely no proof whatsoever as to any dates that these alleged occurrences happened. There's not even any years been established as far as when these offenses allegedly occurred." The defendant argues that the trial court failed to require the State to elect any one particular offense or any particular date or incident upon which the State was relying as to any particular count or victim.

In State v. Brown, 992 S.W.2d 389 (Tenn. 1999), our supreme court analyzed the responsibility of the State, when multiple offenses have been proven, to elect that offense or offenses for which it is seeking a conviction. The court described the charges against Brown:

> The victim, M.T., who was six years of age at the time of trial, lived across the street from the defendant, James A. Brown. She first testified that two years earlier, when she was four years of age, the defendant pulled up her dress, pulled down her underwear, and "put his finger down in her private part." M.T. testified that the act occurred in Brown's trailer. She could not recall the exact date this happened, only that it was a Friday and that it was warm outside.

> The victim's testimony as to the number of acts committed varied. She initially testified that Brown penetrated her private part with his finger five times on the same occasion. She later said that it happened five different times, on different days. She also acknowledged that she had told the police that it

13

> happened only twice. She also testified that on a later occasion, after the alleged acts of penetration, Brown took two photographs of her with her dress pulled up and her underwear visible.

Id. at 390.

Brown was indicted and convicted of one count of the rape of a child. At the conclusion of the trial, the court instructed the jury:

> The indictment alleges that this offense occurred during the period of time between March 1, 1993, and September 30, 1993. *The State has made an election that the alleged incident occurred between Easter, April 11, 1993, and June 30, 1993.*

Id. at 391 (emphasis in original).

The court then explained the reasons for the requirement that the State elect the particular offense or offenses for which it is seeking a conviction, when the evidence indicates multiple offenses against the same victim:

> The requirement of election serves numerous interests: it enables the defendant to prepare for the specific charge; it protects a defendant against double jeopardy; it enables the trial judge to review the weight of the evidence in its role as thirteenth juror; and it enables an appellate court to review the legal sufficiency of the evidence. The most important interest served by election, however, is to ensure that the jurors deliberate over and render a verdict based on the same offense[.]

Id. at 391 (citations omitted).

In Brown, the State attempted to make its election of offenses by narrowing the time frame as to when the offenses occurred from the seven-month period alleged in the indictment to a two and one-half month period. However, the court, noting that the State's narrowing of the dates had not resolved the conflicts between the victim's differing statements that the acts occurred "five times during one visit in his trailer," or "five times on different days," or "occurred [only] twice," held the election was insufficient. Brown, 992 S.W.2d at 392. Additionally, the court noted that the victim testified that the acts of digital penetration had occurred before the defendant had taken her photograph which the victim's mother had first seen prior to Easter, April 11, 1993. The State had elected that date as the beginning of the period when the offense had occurred. Accordingly, the court concluded that the State's election was insufficient and reversed and remanded the case for a new trial.

We will now apply the rationale of Brown to this matter.

14

**Allegations of the Indictment as to KF**

The defendant was tried for four counts in the indictment as to KF. Counts 1, 4, and 5 alleged the offense of rape, and Count 2 alleged sexual battery. The dates alleged as to each offense were as follows:[4]

**Count 1:** **"on the ___ day of October or November, 1995"**

**Count 2:** **"on the ___ day of May, 1995"**

**Count 4:** **"on the ___ day of February, 1996"**

**Count 5:** **"on the ___ day of June, 1996"**

**Testimony of KF**

KF testified that her date of birth was December 8, 1980, and that the defendant first had sexual intercourse with her "a couple of weeks before [her] fifteenth birthday," which meant this act allegedly occurred shortly before December 8, 1995. This period coincides with Count 1 of the indictment, alleging that an act of rape occurred in October or November 1995. The defendant was found not guilty of Count 1.

KF also testified that, on another occasion, she had gone to the camphouse with the defendant where he "touched me on my breasts and on my vagina," and she asked him to stop. She said this incident occurred in "the summer time because I was out of school," that it happened before the rape which occurred just before her fifteenth birthday, and that she was "only fourteen then or fourteen and a half." This testimony coincides with Count 2, which alleged an act of sexual battery occurring in May 1995, and for which the defendant was convicted.

Further, KF testified that "maybe eight" other acts of rape occurred, always at the camphouse. She was not able to otherwise differentiate these additional acts as to which she testified. The defendant was found not guilty as to Count 4, alleging an act of rape in February 1996, and Count 5, alleging rape in June 1996.

On the basis of this testimony, we conclude that the State sufficiently proved the act of sexual battery alleged in Count 2, and that it was done with sufficient detail so as to make certain that all jurors were considering the same alleged incident. Additionally, the victim's testimony was sufficiently detailed so as to prevent reprosecution for the same offense. Further, the defendant did not show that he was prejudiced in his defense

---

[4]In our analysis, we are not considering those counts which were dismissed prior to the trial.

because the allegations of Count 2 did not set out a specific date of the offense. Accordingly, as to the allegations of KF, the assignment of error is without merit.

**Allegations of the Indictment as to BC**

As to BC, the defendant was tried and found not guilty of two counts of rape (Counts 6 and 7). The defendant was convicted of one count of sexual battery (Count 9). The alleged dates for each offense were as follows:

Count 6: "on the ___ day of June, 1995"

Count 7: "on the ___ day of August or September, 1995"

Count 9: "on the ___ day of ___, 1995"

**Testimony of BC**

BC testified that the first time the defendant raped her was in June 1995, while she was babysitting at his house. He called her into a bedroom, held her on the bed, and raped her, according to her testimony. This testimony coincides with the allegations of Count 6, for which the defendant was found not guilty. BC testified that the next act occurred at the camphouse just after she had started school in the fall. She had gone to the camphouse with the defendant and his daughter and got drunk and passed out. When she awoke, the defendant was performing oral sex on her. She did not testify as to the specifics of any other sexual act. The defendant was also found not guilty of rape alleged in Count 7.

As to Count 9, sexual battery against BC, the State concedes that election was necessary. The indictment indicated only that the defendant committed sexual battery against BC on an unspecified day in 1995. At trial, BC was unable to remember any specific incident of sexual battery:

> Q. Do you remember the first time he ever touched you inappropriately?
>
> A. No, because there's been so many times.
>
> Q. What do you mean?
>
> A. He's - - he's always tried to touch on me - - tried to touch on me, but I can't remember the first time he's ever done it.

We agree with both the State and the defendant that the State did not sufficiently elect an offense upon which to base this conviction. We, therefore, reverse the conviction for sexual battery in Count 9 and remand for a new trial. See State v. Brown, 992 S.W.2d 389, 392-93 (Tenn. 1999).

16

**Allegations of the Indictment as to TH**

As to TH, the defendant was tried on a single count, which charged aggravated sexual battery. The indictment alleged the date as follows:

Count 11:    "on a ___ day in January or February, 1996"

**Testimony of TH**

TH was ten years old at the time of her trial testimony. She testified that on a night she spent at the camphouse with the defendant, he took her clothes off, as well as his own, and put her in the tanning bed in his daughter's bedroom. He then started "feeling" of her and touched her on the vagina. She did not know what month this occurred, but it was "real cold."

Our supreme court, in Brown, traced decisions requiring less specificity in indictment allegations in cases of child sexual abuse:

> We are sensitive to the fact that young children who are victims of child abuse may not be able to testify that abuse occurred on a specific date, or provide extensive details in this regard. We have therefore emphasized in Shelton that election may be accomplished in multiple ways:
>
>> If, for example, the evidence indicates various types of abuse, the prosecution may identify a *particular type of abuse* and elect that offense. Morever, when recalling an assault, a child may be able to describe *unique surroundings or circumstances* that help to identify an incident. The child may be able to identify an assault with *reference to a meaningful event* in his or her life, such as the beginning of school, a birthday, or a relative's visit.
>
>> These broad guidelines accommodate the practical difficulties in cases involving child victims while also implementing the protections served by the election requirement. In short, "[a]ny description that will identify the prosecuted offense for the jury is sufficient."

Id. at 391-92 (emphasis in original) (quoting State v. Shelton, 851 S.W.2d 134, 138 (Tenn. 1993)).

Since the defendant was tried and convicted of only one count as to TH, election of offenses was not an issue. Based upon our review, we conclude that the allegations of the indictment were sufficient and that TH testified as to the elements of aggravated sexual battery. Since the defendant has not shown prejudice because a specific date for the offense was not alleged, the assignment of error is without merit as to TH.

**Allegations of the Indictment as to JC**

17

As to JC, the defendant was tried and convicted of two counts of sexual battery (Counts 13 and 14) and one count of contributing to the delinquency of a minor (Count 15). The offenses were identified as follows:

Count 13: "on the ___ day of November, 1996"

Count 14: "on the ___ day of February, 1997"

Count 15: "on a date beginning in December, 1996 and ending in May, 1997"

## Testimony of JC

The indictment alleged two counts of sexual battery against JC, occurring on the "___ day of November, 1996" and the "___ day of February, 1997." However, JC testified as to three incidents of inappropriate touching, two apparently occurring around November 1996, and the third occurring at a time which was not described with precision in JC's testimony. Although JC did so reluctantly, and not in detail, she testified as to three acts of sexual battery, although only two were alleged in the indictment. Accordingly, we reverse the convictions as to Counts 13 and 14, remanding each for a new trial. In doing so, we fully recognize that the State's difficulty in making its election of offenses was caused by the substantial changes JC made in her testimony between the preliminary hearing and the trial.

Count 15, the misdemeanor count of contributing to the delinquency of JC, a minor, charged the defendant with "providing alcoholic beverages and cigarettes upon request." The time frame in the indictment is December 1996 through May 1997. The State concedes that JC did not testify that the defendant provided her with alcohol or cigarettes. Accordingly, we reverse the conviction as to Count 15 and dismiss the charge. See Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt.").

## C. Other Bad Acts Testimony

The defendant argues that the trial court should have followed the procedures set out in Tennessee Rule of Evidence 404(b) regarding testimony of other bad acts of the defendant prior to allowing admission of such testimony.

Evidence that a defendant has committed some other crime independent of that for which he is being tried is generally not admissible because it is irrelevant. See Bunch v.

State, 605 S.W.2d 227, 229 (Tenn. 1980). If, on the other hand, the evidence of another crime is relevant on a contested issue at trial, the trial court must follow certain procedures before admitting the evidence:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. (404)(b).

At the pretrial hearing on May 28, 1998, the trial court considered the defendant's Rule 404 motion in limine. With regard to that motion, the prosecutor announced, "We know of no prior criminal history." Since the defendant did not testify, he was not cross-examined as to any bad acts. However, he has complained about the State's presenting proof, presumably through the testimony of its witnesses, as to "other bad acts on the part of the defendant as to each and every alleged victim in the indictment including acts as to certain counts of the indictment which had been dismissed, (Counts 3, 8, 10, 12), and in the non-severed cases so that all bad acts against all victims were admitted into evidence in the trial as substantive evidence as to all other victims without curative jury instructions from the trial court." However, there are no citations to the record regarding these bad acts. Accordingly, this issue is waived. Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b).

### D. Prior Inconsistent Testimony

JC recanted her testimony at the preliminary hearing by testifying at trial that the defendant had never "touched me in my female body parts." Defendant argues that the trial court should not have allowed the State to introduce prior inconsistent statements.

Prior inconsistent statements of a fact witness are admissible under impeachment attack. The only requirement is that the witness be "afforded an opportunity to explain or deny the same." Tenn. R. Evid. 613(b). In this case, after the witness testified at trial that the defendant had never "touched me in my female body parts," the State was properly allowed to present prior inconsistent testimony to impeach her. See Tenn. R. Evid. 607 ("The credibility of a witness may be attacked by any party, including the party calling the witness.").

19

Thus, under the circumstances, the State was properly allowed to impeach JC with her prior inconsistent statements. The remainder of the defendant's arguments regarding the evidentiary use of the prior statements is moot in view of the reversal of the convictions as to JC.

**E. Reinstatement of Severed Count**

At the hearing on motions held on May 28, 1998, Counts 11 and 12, charging the defendant with aggravated sexual battery against TH, were discussed at length. The obvious problem for the State was, as the trial court noted, "you've got the same victim and the same dates." In fact, the counts were identical. Defendant argued for dismissal of both counts. The State asked to add a different date to Count 12. The trial court offered to sever both charges and try them separately, noting that the State would still, at some point, have to deal with the fact that the counts contained the same language. Both parties agreed to this. Before the hearing ended, the following exchange took place:

> GENERAL PEEPLES: Could I ask you to revisit the question regarding Counts Eleven and Twelve?
>
> THE COURT: I'll be glad to. What would you like for me to do? Put them back in there?
>
> GENERAL PEEPLES: We'd like for you to strike one of them and leave the other one in.
>
> THE COURT: All right. Take your choice.
>
> GENERAL PEEPLES: It doesn't matter. They say the same thing, Your Honor.
>
> THE COURT: You're gonna drop one. Enter an Order nolle prosequi as to Count Twelve. You've got Eleven back in there and I'll try them all in one trial.
>
> MR. MADDOX, III: That's fine.

Defendant now argues that the "trial court was aware of the improper joining of the counts, and should have refused to reinstate Count 11 on the application of the prosecution after having previously granted the severance."

In this matter, the Haywood County Grand Jury returned a multi-count indictment against the defendant. No motion for severance was filed pursuant to Tenn. R. Crim. P. 14, and there was no "severance" as such. The matter arose when the trial court noted that Counts 11 and 12 were identical. Although the court proposed that one of these counts be severed, this was merely one of the options being discussed. The record does not reflect that there was a "severance," as contemplated by Rule 14, Tenn. R. Crim. P.

20

and, further, the defendant agreed to the action taken, that Count 11 remain as part of the indictment and Count 12 be dismissed. Accordingly, this assignment is without merit.

## II. Prosecutorial Misconduct

Defendant argues that prosecutorial misconduct amounted to error in two ways: (1) when the assistant district attorney general brought the witness, TH, age ten, into the courtroom carrying a Beanie Baby and later, during the direct examination of TH, patted her on the shoulder, brushed the hair from her eyes, and told her, "It's almost over now, Honey"; and (2) when an employee of the prosecutor's office advised the victims of their rights under the Criminal Injuries Compensation Act.

Factors which this court may consider when reviewing a charge of prosecutorial misconduct include: (1) the intent of the prosecutor; (2) the curative measures taken by the trial court; (2) the misconduct in context and in light of the facts and circumstances of the case; (3) the cumulative effect of the remarks with any errors in the record; and (4) the relative strength or weakness of the case. See State v. Farmer, 927 S.W.2d 582, 590-91 (Tenn. Crim. App.), perm. app. denied (Tenn. 1996) (citing Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)). To be entitled to relief, the defendant must show that the conduct of the prosecutor was so improper that it affected the verdict to the detriment of the defendant. See id.

During a bench conference, the trial court specifically addressed the defendant's vigorous objection to the presentation and handling of TH. The trial court made these observations regarding the prosecutor's actions:

> THE COURT: This Court did not view it as being inappropriate. This was a young child who was obviously scared who was escorted in by what I'm informed is the Prosecutor's Witness Coordinator, quite properly so, and when I discovered how young she was I ordered her back out of the Courtroom with counsel since the Witness Coordinator had already gone until I explained to the jury that I had to qualify her. The girl was then put on the stand and was still scared to death, and it's not a teddy bear. It's a little old dog that the Mama said she bought - - or she said her Mama bought her.
> I know of nothing that was grossly inappropriate. The fact that counsel stepped up to counsel the child - - she had her head down and she was unable to talk because she was crying, and I don't - -
>
> MR. D. D. MADDOX: Counsel touched the witness, Your Honor.
>
> THE COURT: Counsel - -
>
> MR. D. D. MADDOX : She patted her on her head.

21

> THE COURT: Counsel - - yes, patted her on her head and pulled her hair out of her eyes. I saw that, and I wasn't about to tell her not to do it for fear of making a scene out of it. But I don't think that there was anything that was inappropriate. And incidentally, Counsel had her back to the jury so the child - - they couldn't really see her - - what she was doing.

The defendant must show that he was prejudiced by these acts to the extent of affecting the verdict. Defendant points to no evidence that the jury found him guilty of aggravated sexual battery against TH based on improperly elicited sympathy for the witness. We conclude that these acts did not affect the verdict. The presentation and handling of this witness/victim did not go to the heart of the essential elements of the crime charged. See State v. Gibson, 973 S.W.2d 231, 245 (Tenn. Crim. App. 1997), perm. app. denied (Tenn. 1998) (in prosecution for rape of a child, the trial court did not abuse its discretion in allowing the victim to testify while holding a teddy bear). We find no error as to this issue.

The defendant has also assigned as error the victims' being advised of their potential rights pursuant to the Criminal Injuries Compensation Act. The Victims' Bill of Rights, Tenn. Code Ann. §§ 40-38-101 to-208 (1997), is the expression of our legislature's intent "that victims and witnesses shall have certain rights in this state and that they shall be made aware of these rights." Id. § 40-38-101(a). This Act further provides, in part:

> **Notice to crime victims of eligibility for compensation.—**
> The office of the district attorney general shall notify in writing each victim of a violent crime who may be eligible for compensation under the Criminal Injuries Compensation Act, compiled in title 29, chapter 13, of the methods by which the victim may obtain such compensation.

Id. § 40-38-109 (Supp. 1997).

Carolyn Milligan, Victim Witness Coordinator for the Twenty-Eighth Judicial District of the State of Tennessee, testified that she met with the alleged victims at the preliminary hearing "[t]o explain to them their rights under the Tennessee Victim's Rights Act and to explain to them the Tennessee Criminal Injury Compensation Fund." The defendant admits that accurate information concerning the victims' compensation awards was given,[5] **but he finds error with the timing. Defendant cites no authority other than "common fairness." This issue is without merit.**

---

[5]Compensation for pain and suffering is available only to victims of sex offenses. **See Tenn. Code Ann. § 29-13-106(c) (Supp. 1998). A pain and suffering award cannot exceed $3,000. See id. § 29-13-107(3) (Supp. 1998).**

## III. Instruction As To Possible Penalties

The 1998 amendment to Tenn. Code Ann. § 40-35-201(b) (Supp. 1998), states:

> In all contested criminal cases, except for capital crimes which are governed by the procedures contained in §§ 39-13-204 and 39-13-205, and as necessary to comply with the Constitution of Tennessee, article VI, section 14, and § 40-35-301, the judge shall not instruct the jury, nor shall the attorneys be permitted to comment at any time to the jury, on possible penalties for the offense charged nor all lesser included offenses.

This amendment applies to "all trials occurring after May 18, 1998." Id. Compiler's Notes.

Defendant argues that the court erred in applying this statute in his case. Defendant's trial was held on June 30 and July 1, 1998; therefore, the statute applied.

Defendant additionally argues that, even though technically applicable, the statute cannot be applied in his case because the offenses were committed prior to the effective date of the statute and to apply the law in his case would unconstitutionally deny him of substantive rights in violation of Article I, section 11 of the Tennessee Constitution, prohibiting ex post facto laws. We disagree. Section 11 of Article I states the following:

> **No ex post facto laws.**—That laws made for the punishment of acts committed previous to the existence of such laws, and by them only declared criminal, are contrary to the principles of a free Government; wherefore no Ex post facto law shall be made.

Our supreme court has stated that the critical question in an ex post facto analysis is "whether the law changes the punishment to the defendant's disadvantage, or inflicts a greater punishment than the law allowed when the offense occurred." State v. Pearson, 858 S.W.2d 879, 883 (Tenn. 1993). In Miller v. State, 584 S.W.2d 758, 761 (Tenn. 1979), our supreme court adopted five broad classifications of ex post facto laws. The classifications are:

1. A law which provides for the infliction of punishment upon a person for an act done which, when it was committed, was innocent.

2. A law which aggravates a crime or makes it greater than when it was committed.

3. A law that changes punishment or inflicts a greater punishment than the law annexed to the crime when it was committed.

4. A law that changes the rules of evidence and receives [sic] less or different testimony than was required at the time of the commission of the offense in order to convict the offender.

> 5. Every law which, in relation to the offense or its consequences, alters the situation of a person to his disadvantage.

Amended Tenn. Code Ann. § 40-35-201(b) changed a procedure the courts and attorneys are to follow in most contested criminal cases by prohibiting the charging of the jury by the trial court or the informing of the jury by attorneys of the possible penalties that apply to the crime charged or lesser included crimes. Defendant fails to produce any credible grounds for interpreting this amended statute as an ex post facto law when applied to him. This issue is without merit.

## IV. Special Verdict Form

We have reviewed the special verdict form used in this case. As to Counts 2, 9, 11, 13, 14, and 15, the jury found the defendant guilty of both the first listed charge and the lesser-included listed charge and assessed a fine as to both the first charge and the lesser-included offense.[6] **The defendant argues that this clearly demonstrates a lack of comprehension and misunderstanding on the part of the jury.**

---

[6] An excerpt from the special verdict form, as completed by the jurors, is illustrative:

| COUNT | OFFENSE OR LESSER INCLUDED OFFENSE | MAXIMUM FINE ALLOWED | VERDICT | FINE IF ANY |
|-------|------------------------------------|----------------------|---------|-------------|
| 2 | **sexual battery** (KF-May 1995) | $1,000 | not guilty/ (guilty) | $1,000 |
| | lesser included offense: **assault** | $500 | not guilty/ (guilty) | $500 |

24

At the hearing on defendant's motion for a new trial, the trial court addressed this issue in the following way:

> The jury verdict form was in fact given to counsel before the trial in this case and suggestions elicited as to how to make it clearer or better. For purposes of your record and in an attempt to make the job as easy as possible the counts were given to the jury out of order, but by the victim's names. In other words, if you look at them you've got all of the alleged or the now victims grouped by name to make it easier for the jurors to arrive at a verdict. They did indeed on counts 1, 4, 5, 6, and 7 come down and find the defendant properly not guilty of not only the offense, but of the lesser included offenses and then you moved in to your remaining counts there and the jury was questioned at some length as to when they came in with that verdict. This is not uncommon in taking verdicts from jurors who have great difficulty in determining whether a person could be guilty of both the lesser and the greater offenses.

Having been given the opportunity to review the jury verdict form before the trial, the defendant is in no position to argue now that it was unclear.

Defendant finally argues that the completed special verdict form is a nullity on its face and no judgment or sentence of the trial court can be allowed to stand. It is the duty of the trial court to give effect to the intention of the jurors if, after examination of the terms of the verdict, the court is able to place a construction on the terms that will uphold the verdict. See Hogan v. Doyle, 768 S.W.2d 259, 263 (Tenn. App. 1988). A reasonable interpretation of the terms of the verdict is that the jurors intended to find the defendant guilty of the principal charge in Counts 2, 9, 11, 13, 14, and 15. The jury was carefully instructed by the trial court, and there is no indication that the jurors were confused or misled or intended any result other than that accepted by the trial court. The trial court, in reading the verdict, noted that "You've also found him guilty of the lesser included. That will be set aside since it merges or is included within the greater offense." The trial court asked the foreman, "Have I read it correctly?" to which the foreman replied, "Yes, Your Honor." This issue is without merit.

**CONCLUSION**

We affirm the convictions as to Counts 2 (sexual battery) and 11 (aggravated sexual battery). We reverse and remand for a new trial the convictions in Counts 9, 13, and 14, (each charging sexual battery). We reverse and dismiss the conviction in Count 15 (contributing to the delinquency of a minor).

_____
ALAN E. GLENN, JUDGE

CONCUR:

_____
JOHN H. PEAY, JUDGE

_____
NORMA McGEE OGLE, JUDGE

26