IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
November 5, 2002 Session

## STATE OF TENNESSEE v. KEVIN L. LAWRENCE

**Direct Appeal from the Criminal Court for Shelby County
No. 99-12786     Chris Craft, Judge**

----

**No. W2001-02638-CCA-R3-CD  - Filed October 9, 2003**

----

A Shelby County jury convicted the Defendant of first degree felony murder, and the trial court sentenced the Defendant to imprisonment for life with the possibility of parole.  The Defendant now appeals, contending the following: (1) that the trial court erred when it denied his motion to suppress his statement to police; (2) that the trial court erred when it denied his motion for mistrial based upon a witness's non-responsive statement; (3) that the trial court erred in permitting the prosecution to assert matters not in evidence during closing arguments; and (4) that the trial court committed plain error by incorrectly instructing the jury with respect to the culpable mental state of "knowingly."  Finding no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID G. HAYES and JOE G. RILEY, JJ., joined.

William D. Massey and C. Michael Robbins, Memphis, Tennessee (on appeal), and William D. Massey and Lorna McCluskey, Memphis, Tennessee (at trial), for the appellant, Kevin L. Lawrence.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Braden H. Boucek, Assistant Attorney General; William L. Gibbons, District Attorney General; Jennifer Nichols and Phyllis Gardner, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
## I.  Facts

This case arises from a robbery and killing of the victim, Rodney Foster, on December 28, 1998.  In connection with this killing, the Defendant, Kevin Lawrence, along with two co-

defendants, Toby Bailey[1] and Christopher Lawson,[2] was indicted on charges of first degree premeditated murder and murder committed during the commission of a felony. A Shelby County jury found him guilty of murder committed during the commission of a felony and second degree murder, as a lesser-included offense of first degree premeditated murder. The trial court merged the second degree murder conviction with the felony murder conviction and sentenced the Defendant to imprisonment for life with the possibility of parole. The Defendant now appeals.

Willie Evelyn Foster, the victim's mother, testified that on the evening of December 28, 1998, she was at her home, 3508 Boxdale, Apartment 3 in the Wooddale Condominium complex. Also present in the apartment were the following persons: the victim, Rodney Foster; his girlfriend, Tiffany Butts; Willie Foster's daughter, Kimberly Foster; Kimberly Foster's two minor children; and the victim's friend, Marcus Lee. Willie Foster testified that between seven o'clock and eight o'clock in the evening on December 28th she was in her room in the back of the apartment with her two grandchildren talking to her sister on the phone. Willie Foster stated that suddenly she heard a shot and some "tumbling." Willie Foster testified that a man then came into the bedroom with a gun and told her to stay in the bedroom. She stated that the intruders asked her "Where the money at? Where the weed at?" and she responded that she didn't know what they were talking about. Willie Foster testified that the intruder left the room briefly and, when he returned, he brought Kimberly Foster and Tiffany Butts back into the room. According to Willie Foster, the intruder had a gun and repeated his inquiry as to the location of the money and weed. The intruder held the occupants of the bedroom at gun point. Willie Foster testified that a few minutes later the intruder left the room and Kimberly Foster left to look for her brother, Rodney Foster, whom she found laying on the kitchen floor bleeding. Willie Foster then said that she went to call 911, but before she could complete the call, Marcus Lee entered the kitchen with police.

Willie Foster testified that the intruder who came into her bedroom wore a black leather coat that had a hood attached which came down to his eyebrows, but that she did not look at him "all the way" because she feared that he would shoot her. Accordingly, Willie Foster could not identify the intruder who was in her bedroom that night. On cross-examination, Willie Foster testified that, at the police station later that evening, she saw a black "skull cap" underneath a chair in which Marcus Lee was sitting. Willie Foster also admitted that her son, the victim, regularly sold marijuana out of her home.

Kimberly Foster also testified as to the events that occurred on the evening of December 28, 1998. She testified that on the night of the victim's death she was living with her mother and was at home with her children, her mother, the victim, the victim's girlfriend, Tiffany Butts, and the victim's friend, Marcus Lee. Kimberly Foster testified that on the evening of December 28th, she was in the "front" room watching television with the victim, Tiffany Butts and Marcus Lee when there was a knock at the door. Lee answered the door and one male intruder, who was wearing a

---

[1]Toby Bailey was tried jointly with the Defendant and found not guilty by the jury.

[2]The trial court granted Christopher Lawson's motion to sever and he was tried separately.

mask, grabbed the victim and went toward the kitchen. The other man, who had a gun, told her to get up and go in the other room with her mother and children. The man with the gun then took her into the other room while asking her, "Where the money? Where the weed?" and pointing the gun at her. Kimberly Foster testified that she told the intruder that she had no money and no weed and, shortly thereafter, she heard three or four gunshots. The intruders left and, after waiting for a minute, Kimberly Foster crawled up front into the kitchen and saw the victim laying on the floor with a bullet wound in his back. Kimberly Foster testified that at first the victim was able to respond to her and told her that he loved her. She testified that a few minutes later, Marcus Lee returned with the police, who told her to go into the back room.

Kimberly Foster testified that the intruder who held her in her mother's bedroom was wearing dark pants and a black leather coat with a hood on it, which was pulled down to his eyebrows. The hood fell back off the intruder's face and Kimberly Foster described him as "brown skinned, low haircut [and] he had like an oval egg-shaped head, with a big kind of nose. And about standing about five-eight, something like that." Kimberly Foster testified that she had seen this man a couple of times prior to the shooting, and she identified him in the courtroom as the co-defendant Toby Bailey. She also testified that she never saw the intruder who went into the kitchen with her brother, and when the police came back to the house with the Defendant, she could not identify him as being in the apartment earlier that evening. On cross-examination, Kimberly Foster testified that she saw a black "skull cap" on the intruder that shot her brother.

Tiffany Butts, the victim's girlfriend at the time of his murder, testified that she was in Kimberly Foster's room with Marcus Lee and the victim on the night of December 28, 1998, when she heard a knock at the door. She testified that the victim answered the door and she saw the victim fall back as two male intruders rushed into the house. Butts testified that she then hid in a closet in Kimberly Foster's room while Kimberly Foster paced the room. According to Butts, one of the intruders entered Kimberly Foster's room with a gun and had a hood covering part of his face. Butts identified that intruder as Toby Bailey, a co-defendant. Thereafter, Butts identified the Defendant as the other intruder and testified that the Defendant had on a puffy black coat. After the intruder entered the room in which Butts was hiding, he said words to the effect of "whoever is in here come out," and Butts came out of the closet into the hall. Butts testified that the intruder then pointed a gun at her head while she crawled into Willie Foster's room.

Butts testified that the Defendant was in the kitchen with the victim when the robbery occurred and the victim was shot. She also testified that she heard about three or four shots, and after she heard the shots, Toby Bailey looked into the living room, looked back into the bedroom and then fled. Butts testified that after the intruders left, Kimberly Foster went to see the victim, and then Butts followed. They found the victim laying on the kitchen floor with gunshot wounds. Butts testified she saw the Defendant later that evening and recognized him as the same person that was in the apartment with the victim earlier because she recognized his braids and clothes.

On cross-examination, Butts was questioned regarding a photo line-up in which she identified the co-defendant. When asked "So your testimony then, . . . is that until [the police officer] told you

[the co-defendant's] name you didn't have a name; is that right?" Butts responded, "No. I already heard it through the streets what his name was because everybody knew they did it because they was riding around." The Defendant objected and requested a mistrial. After ordering the jury out of the court room, the trial court, finding her in contempt of court, sentenced Butts to five days in jail, and then suspended the sentence and placed her on probation until after the trial. Thereafter, the court denied the motion for mistrial and instructed the jury that:

> From time to time this witness has said things, and I heard from so and so that this, that and the other. Well, those people aren't here, if they are even known. They are not under oath. And people will say all kinds of stuff. . . . And so things that other people say are definitely not proof. So we have a rule called hearsay, that if somebody else says something that is not under oath, you're not to consider it at all.

The trial court told the jury that he had explained this to Butts and that, while she was emotional, she "can't do that."

Butts also testified on cross-examination that she was smoking marijuana on the evening of the murder. Further, she testified that while in the house she could not provide the police officers with a description of the Defendant, but later, when she saw him in the police car outside the home, she recognized him as the intruder who went with the victim to the kitchen.

Marcus Lee testified that on December 28, 1998, he was at the victim's home and was "smoking weed all day." Lee confirmed that on the evening of the murder, Willie Foster was in her room with her grandchildren and Tiffany Butts and Kimberly Foster were in Kimberly Foster's room watching television. Lee testified that he and the victim were in the living room when there was a knock at the door. Lee stated that the victim answered the door and two men "busted" into the living room. Lee testified that the victim and the first intruder stumbled and fell over each other while the second intruder went to the back room. Lee testified that the first intruder, who was with the victim, wore dark colored clothes and a gray and black ski mask and had a gun. Lee testified that the victim and the intruder "made their way to the kitchen" and that Lee was standing in the doorway between the living room and the kitchen. Lee testified that he heard a gunshot as the intruder and the victim were tumbling in the kitchen.

Lee explained that after hearing the gunshot, he ran out of the door of the apartment and saw a policeman two buildings down. Lee stated that he approached the policeman and told him that there were some "guys in the house robbing [his] friend." Another witness at that time confirmed that two men ran "that way" and the policeman went to chase the intruders. When Lee returned to the apartment with the police, the victim was on the floor and appeared to be dead. Lee testified that when he first returned, one of the intruders was still in the kitchen with the victim and that, after seeing the intruder, he left again to find the police. Lee testified that after he found a police officer, the two returned to the apartment and found the victim still on the floor surrounded by his family.

Lee stated that, thereafter, the police put him in the back of a police car and brought over a man, who was wearing the same clothes and coat as the intruder, but Lee did not reveal this information immediately to police. Lee later learned that the man that he saw from the police car was the Defendant. Lee did not immediately identify the Defendant as the same person that he saw the night that the victim was killed, but he later told police that the Defendant was the man who killed the victim. Lee also testified that he identified the Defendant in a photo line up.

Officer Eric Jenson, an officer with the Memphis Police Department, testified that on December 28, 1998, he was at the Wooddale Condominiums at approximately eight o'clock in the evening in response to a 9-1-1 hang-up call. Officer Jenson was the first officer on the scene in response to the 9-1-1 call and pulled up his patrol car to the address from which the call had come. The officer testified that, when he got out of his patrol car, he heard two gunshots from a different apartment in the complex. The officer testified that he then saw an individual running from the complex and that, seconds later, his partner, Officer Ladimer Howell, arrived in a separate patrol car. Officer Jenson testified that he told Officer Howell that he had just heard gunshots, and Officer Howell asked Officer Jenson if he had seen the individual running. Officer Jenson testified that Officer Howell then pursued the individual that was running.

Officer Jenson testified that he heard the police dispatcher state that she received a 9-1-1 call for "shots fired where one person had been shot" and gave the address as 3508 Boxdale, Number 3, which was in the direction from which the officer heard the gunshots. The officer stated that he then proceeded to the given address and was approached by three men who were yelling (one of whom the officer later learned was Marcus Lee), and the officer drew his weapon for his safety. Upon calming the men down, the officer learned that someone had just been shot and proceeded to the apartment, whereupon he found the victim laying face down and in extremely critical condition.

Officer Jenson testified that later he went to where the patrol cars were parked and saw that the man that he had seen running earlier, who he identified as the Defendant, was in the back of a patrol car. The officer testified that the Defendant asked him if he "was the one I saw at the end of the drive when I was running by" to which the officer responded "yes." The officer testified that he then retraced the path of the individual running and found a "small black revolver pistol." The officer identified the Defendant as the man that he saw running that night.

Officer Ladimer Howell, also with the Memphis Police Department, testified that on December 28, 1998, he received a call to an apartment in Wooddale Condominiums in response to a 9-1-1 hang-up call. Officer Howell testified similarly about the conversation that occurred between the two officers upon arriving at the apartment. The officer testified that he saw a man, whom he later learned was the Defendant, come out of a building and run past his car. The officer stated that since Officer Jenson heard the gunshots, Officer Jenson went to investigate the gunshots and that Officer Howell chased the Defendant since he "had a better look at him." The officer drove his patrol car in pursuit of the Defendant, and while pursuing the Defendant, the officer saw the Defendant "hop" a four-foot tall gate at the end of a fence. The officer testified that some children who were standing near the gate opened it for the officer to pursue the Defendant, so the officer did

not have to slow down. The officer stated that he turned on his headlights and then saw the Defendant take off a dark colored jacket and throw it onto a pile of garbage. The Defendant slowed to a walk, and the officer pointed his spotlight on the Defendant and told him to get down on the ground, which he did.

Officer Howell testified that when he was putting handcuffs on the Defendant, he noticed that the Defendant had gray duct tape on his fingertips. The officer testified that he then put the Defendant in the back of his patrol car and retrieved the jacket from on top of the pile of garbage. The officer found it odd that the Defendant removed his jacket because the weather was quite cold and the Defendant had short sleeves on under his jacket. After putting the Defendant in the squad car, the officer heard a "wounding" call over his radio and returned to the apartment complex where he first saw the Defendant running. The officer stated that later, the Defendant was removed from the police car for a more intense search. During this search, the officer noticed that the duct tape was no longer on the Defendant's fingers but was stuffed in the crack of the seat in his car. Officer Howell testified that when he returned to the scene of the murder, he and Officer Jenson took a walk and retraced the steps where they saw the Defendant run. The officer testified that they found a gun and later found a mask.

Officer Mark Rewalt, also with the Memphis Police Department, testified about the crime scene and the revolver that was found. He testified that the revolver contained three live rounds and three spent casings. The officer also stated that he performed a gunshot residue test on the Defendant. Laura Hodge, with the Tennessee Bureau of Investigation Crime Laboratory, was qualified as an expert in gunshot residue tests. Hodge testified that she analyzed the gunshot residue test and found that elements indicative of gunshot residue were present, meaning that the Defendant fired, handled or was near a gun when it was fired.

Tesean Brown testified at trial that he knew the Defendant because they had created a couple of music tapes together and that he also knew the victim from the neighborhood. Brown testified that the Defendant was at his house on December 28, 1998, until around five o'clock in the evening. Brown testified that about a week after the shooting, the Defendant called him and asked Brown to do him a favor. Brown testified that the Defendant told him that "we went to do something" and that when "he was doing it . . . the guy tried to tussle with [me] or something like that and the gun . . . went off by mistake." Brown stated that the Defendant told him about "dishing" the gun, which was a .38, and the mask, and also told him the name of the victim. Brown testified that, thereafter, the Defendant asked him to "tell [the police] that he was over [at] my house earlier that day and he had shot a gun in my backyard" because "the police found some gunpowder on his hand." Brown testified that, at first, he agreed and told the police the Defendant's story, but later told the police the truth. Brown testified that, when the Defendant left his house, he was wearing a "black bubble jacket."

Dr. Cynthia Gardner testified that she is employed with the Shelby County Regional Forensic Center and performed the autopsy on the victim. She determined that the victim died of multiple gunshot wounds. She also testified that she recovered two bullets from the victim's body. Tommy

Heflin, with the Tennessee Bureau of Investigation Forensic Service Division, was qualified as an expert in firearms identification and testified that both bullets retrieved from the victim's body were fired from the .38 revolver that the police found near the crime scene.

Captain Charles Hendricks, an officer with the Homicide Bureau of the Memphis Police Department, testified that he was the case coordinator for the victim's murder and supervised the investigation. Captain Hendricks testified that he interviewed many of the witnesses in this case and that he was present when the Defendant made his statement. The captain stated that prior to giving a statement, the Defendant was read his rights and signed a Miranda waiver form, which was admitted into evidence.

On cross-examination, Captain Hendricks testified that he filled out a prisoner hold form, which is only supposed to be for forty-eight hours, but that the Defendant was held longer. The captain also testified that the Defendant was, thereafter, released without charge.

Sherlie Lawrence, the Defendant's mother, testified at trial that she had a conversation with her son in February of 1999 in which he said that:

> He was there in the apartment and that he and [the victim] fought over a weapon. He said as they were fighting the weapon went off and he felt that the bullet hit the door, one hit the door [or] the wall. He said he tried to get away . . he was running and that Mr. Foster was running after him . . . and that he turned around and he said the weapon went off. He didn't know at that time if it hit Mr. Foster, but he ran.

Sherlie Lawrence testified that the Defendant also told her that when he left the apartment after shooting the victim, he tried to get away by jumping over a fence, but that the police stopped him. She testified that she sent a letter to Captain Hendricks that contained this information. On cross-examination, Sherlie Lawrence testified that she had visions from the Lord about what happened and what she was supposed to do, and that it was for this reason that she was testifying against her son.

Andrea Ruth Johnson Lawrence, the Defendant's wife, testified on his behalf. She testified that she heard the conversation that occurred between the Defendant and his mother and that the Defendant was relaying to his mother the reason that he was arrested and not the facts as they occurred. Andrea Lawrence explained that the Defendant told his mother the details of the crime, but told her that he learned all of those details from the police. Further, she stated that Sherlie Lawrence responded to the Defendant's statement by telling him that this was a sign he was to be a prison minister.

Based upon the aforementioned testimony, the jury found the Defendant guilty of murder committed during the commission of a robbery and also guilty of second degree murder, as a lesser-included offense of first degree murder. The trial court merged the second degree murder conviction into the felony murder conviction and sentenced the Defendant to life in prison with the possibility of parole.

## II. Motion to Suppress

The Defendant contends that the trial court erred when it denied his motion to suppress his statement to Captain Hendricks, the result of a gunshot residue test, and the admission of the duct tape along with related testimony based upon two grounds: (1) he was detained for more than forty-eight hours; and (2) his arrest was unsupported by probable cause. The State counters that, while the Defendant was improperly held for more than forty-eight hours, all the evidence against him was collected within the initial forty-eight hour period; thus, his extended confinement is not relevant to the inquiry into the constitutionality of the gathered evidence. As to the Defendant's second contention, the State counters that there was probable cause for the Defendant's arrest. We agree with the State's assertions on both grounds.

Prior to discussing any further arguments by the Defendant, we first address his assertion that the trial court erred when it denied his motion to suppress his statement to Captain Hendricks. After reviewing the Defendant's brief, which only cites to testimony presented at the suppression hearing, and our own review of the record, we have found no reference to this statement at the trial.[3] Captain Hendricks, who provided testimony regarding the Defendant's statement at the suppression hearing, did not testify about the Defendant's statement at the trial. Therefore, the decision by the trial court not to suppress this testimony, to which the Defendant objects, is surely of no consequence since this evidence was never presented. Accordingly, we will only address the Defendant's assertion that the trial court erred when it refused to suppress the evidence of duct tape on the Defendant's fingers and the results of the gunshot residue.

In the Defendant's brief, he strongly relies on State v. Huddleston, 924 S.W.2d 666 (1996), to support his assertion that the trial court wrongfully denied his motion to suppress. The Defendant notes that he was detained for more than forty-eight hours, and that his detention was, therefore, illegal. Implicitly, he argues that any evidence obtained at any time during the detention should be suppressed due to his illegal detention. We first note that Huddleston applies only to statements by a defendant and not to other evidence obtained during an illegal detention. See id. at 671. As we have found that no evidence of the Defendant's statement was presented at trial, Huddleston does not apply to this case. Even if Huddleston applied, the Huddleston court stated, "Obviously, if the statement was given prior to the time the detention ripened into a constitutional violation, it is not the product of the illegality and should not be suppressed." Id. at 675. The statement by the Defendant was given only a few hours after his arrest and was not a product of his illegal detention.

Having so decided, we turn to the Defendant's assertion that the evidence against him should be suppressed because it was a product of a warrantless arrest absent probable cause. The standard of review for a trial court's findings of fact and conclusions of law in a suppression hearing was established in State v. Odom, 928 S.W.2d 18 (Tenn. 1996). When the trial court makes findings of fact at the conclusion of a suppression hearing, the facts are accorded the weight of a jury verdict. State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994). The trial court's findings of fact are

---

[3]We note that the Defendant's statement was not a confession, rather it was a denial of involvement in the crime.

"presumptively correct on appeal" and are binding upon this Court unless the evidence in the record preponderates against them. State v. Randolph, 74 S.W.3d 330, 333 (Tenn. 2002); State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998); Odom, 928 S.W.2d at 23. The prevailing party in the trial court is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Furthermore, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Id. However, this Court reviews the trial court's application of the law to the facts de novo, without any deference to the determinations of the trial court. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001).

"An officer may, without a warrant, arrest a person . . . when a felony has in fact been committed, and the officer has reasonable cause for believing the person arrested [has] committed it." Tenn. Code Ann. § 40-7-103 (a)(3) (1997). Reasonable or probable cause is such as would justify a reasonable person to believe that the person arrested was guilty of the felony. Wadley v. State, 634 S.W.2d 658, 663 (Tenn. Crim. App. 1982). Our Supreme Court has defined "probable cause" as "a reasonable ground for suspicion, supported by circumstances indicative of an illegal act." Henning, 975 S.W.2d at 294. Upon a showing of probable cause to believe that a crime has been committed and that the suspect of the investigation committed that crime, a custodial arrest may properly be made. State v. Crutcher, 989 S.W.2d 295, 300 (Tenn. 1999).

After the suppression hearing in the case under submission, the trial court made specific findings of fact and then found:

> [T]he detention and arrest of the defendant were proper under the totality of the circumstances. After receiving a dispatch regarding the 911 hangup call, the officers had a duty to investigate. Immediately after arriving on the scene, they heard shots fired, and saw the defendant running from the scene five seconds later. While following the defendant, Officer Howell saw him jump a fence and remove his coat in 35 degree weather, throwing it on a garbage pile. He therefore had reasonable suspicion to detain him for further investigation. After his partner made the scene, and determined a robbery and possible felony murder had been committed, they found the mask and gun along the route the defendant used to flee, and observed that the defendant had attempted to remove and hide the tape on his fingers, they had probable cause to arrest him.

We conclude that the evidence does not preponderate against this finding, and, accordingly, affirm the trial court's denial of the Defendant's motion to suppress.

### III. Motion for Mistrial

The Defendant argues that the trial court erred by denying his motion for a mistrial after the witness Tiffany Butts volunteered the statement: "I already heard it through the streets what his name

was because everybody knew they did it because they was riding around." The granting or denial of a mistrial is a matter within the sound discretion of the trial court. State v. Hall, 976 S.W.2d 121, 147 (Tenn. 1998); State v. McKinney, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996); State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). This Court will not disturb such a decision absent a finding of an abuse of discretion. Hall, 976 S.W.2d at 147; State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996); Millbrooks, 819 S.W.2d at 443. "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." Williams, 929 S.W.2d at 388. A trial court should grant a mistrial only when it is of "manifest necessity." Id.; Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). "In other words, a mistrial is an appropriate remedy when a trial court cannot continue, or a miscarriage of justice would result if it did." State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000) (citing State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994)). The burden of establishing a "manifest necessity" is upon the appellant. Williams, 929 S.W.2d at 388.

Following Butts's statement that "everybody knew they did it," the trial court admonished Butts to "[o]nly answer the question and if you continue to give extra information, we will have to stop this trial and we'll have a contempt hearing on you." Thereafter, defense counsel asked Butts, "Someone in the community told you a name?" Butts disobeyed the trial court's instruction to only answer defense counsel's question with either a yes or no by stating, "Yes, the groundsman." The trial court immediately took a recess and ordered the jury out of the courtroom. During Butts's contempt hearing, the trial court found Butts in contempt and sentenced her to five days in jail, which was suspended until the end of the trial. The trial court again admonished Butts that if she said "another word that [was] not in direct answer to these questions," she would go to jail after the trial and the trial court would add more jail time consecutive to the five days.

Following the contempt proceedings, defense counsel stated,

I feel compelled and just in an abundance of caution at this point to ask for a mistrial. This jury has been tainted. And it's been tainted in a very tough case where somebody is fighting for their life right now. And what this jury has heard, that bell has been rung by saying everybody knows that these people did it.

The trial court explained that "[m]y concern is that the defendants get a fair trial. And I don't want anybody to start any emotional nonsense. So I am just doing what I have to do. But I find on the record there is no manifest necessity whatsoever for a mistrial. . . ." Accordingly, the trial court denied the Defendant's motion for a mistrial. Once the jury returned, the trial court gave a lengthy curative instruction concerning Butts's statement:

From time to time this witness has said things, and I heard from so and so that this, that and the other. Well, those people aren't here, if they are even known. They are not under oath. And people will say all kinds of stuff. . . . And so things that

-10-

other people say are definitely not proof. So we have a rule called hearsay, that if somebody else says something that is not under oath, you're not to consider it at all.

So I've explained to Ms. Butts . . . that she can't just talk. And some people can't stop talking and I hope she is not that way. But people have emotions and feelings and she may just tend to just talk on. And only after there is something that she says, she doesn't know that it doesn't comport to the rules of evidence because she doesn't understand the rules of evidence, she's not familiar with it. . . .

And the problem is that since she wasn't asked a question about that, she'll start tainting it and saying it and the lawyers can't object until they've already heard it, which means you've already heard it. . . . The one side asked a question, the other side was objecting and she continued on anyway before I could even rule. She understands now that she can't do that. And I've let her calm down. . . .

But what I'm going to tell you, if there is anything that she said that somebody else told her or said, you are not to accept that as evidence in this case at all. We don't know who those people were. We don't know what they were doing. And you have to dismiss that from your mind. It is not evidence in this case. Can everybody follow that? I see all these heads. Anybody say they can't follow that? All right. . . .

After thoroughly reviewing the record regarding Butts's improper statement, we conclude that the trial court did not abuse its discretion by denying the Defendant's motion for a mistrial. In our view, there was no manifest necessity for a mistrial in this case. While Butts's statement was certainly improper and prejudicial to the Defendant, the trial court's actions following the statement ensured two things: (1) that jury members understood that Butts's statement was improper and that they should not consider it as evidence in the case; and (2) that Butts would no longer make unsolicited gratuitous comments in front of the jury. First, by giving the jury a lengthy curative instruction, the trial court ensured that jurors would not consider Butts's improper statement as evidence in the Defendant's case. Second, by finding Butts in contempt and admonishing her to behave properly as a witness, the trial court ensured that Butts would only answer the questions asked of her and not give any more gratuitous comments. The trial court explicitly asked jurors whether they understood the curative instructions, and all the jurors indicated that they would follow those instructions. The Defendant did not object to the instructions at trial and does not contest them on appeal. We must presume that the jury properly followed the trial court's instructions absent clear and convincing proof to the contrary. See State v. Smith, 893 S.W.2d 908, 923 (Tenn. 1994); State v. Woods, 806 S.W.2d 205, 211 (Tenn. Crim. App. 1990); State v. Vanzant, 659 S.W.2d 816, 819 (Tenn. Crim. App. 1983). Here, the Defendant has not shown that the jury did not follow the trial court's instructions. Accordingly, we conclude that the trial court did not err by denying the Defendant's motion for a mistrial.

## IV. Prosecution's Closing Argument

The Defendant next contends that certain remarks made by the prosecutor during closing argument were so inflammatory that they affected the verdict to the prejudice of the Defendant. Among the factors considered by this court when reviewing an allegation of prosecutorial misconduct are: the intent of the prosecutor; the curative measures undertaken by the court; the improper conduct viewed in context and in light of the facts and circumstances of the case; the cumulative effect of the remarks with any errors in the record; and the relative strength or weakness of the case. State v. Farmer, 927 S.W.2d 582, 590-91 (Tenn. 1996); Judge v. State 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976). In order to be entitled to relief, the defendant is required to show that the argument of the prosecutor was so inflammatory or the conduct so improper that it affected the verdict to his detriment. Farmer, 927 S.W.2d at 591.

None of the statements objected to on appeal by the Defendant was objected to during the trial. It is well settled that without a contemporaneous objection to a prosecutor's statements, the error is waived. Id. at 591; State v. Hall, 8 S.W.3d 593, 603 (Tenn. 1999); State v. Sutton, 562 S.W.2d 820, 825 (Tenn. 1978). After reviewing the record, we note that the Defendant did not object to the statements by the prosecutors and, accordingly, has waived this issue on appeal.

## V. "Knowingly" Instruction

Finally, the Defendant argues that the trial court committed plain error by incorrectly defining "knowingly" in its charge to the jury. At the conclusion of the trial, the trial court gave the jury instructions regarding each offense for which the Defendant was charged.[4] The trial court defined second degree murder in its instructions as follows:

> Any person who commits second degree murder is guilty of a crime.
>
> For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> (1) that the defendant unlawfully killed [the victim];
>
> and
>
> (2) that the defendant acted knowingly.

---

[4]The trial court included instructions on the following crimes: premeditated first degree murder, second degree murder, facilitation of premeditated first degree murder, facilitation of second degree murder, voluntary manslaughter, facilitation of voluntary manslaughter, reckless homicide, criminally negligent homicide, first degree murder during the perpetration of robbery, and facilitation of first degree murder during the perpetration of robbery.

"Intentionally" means that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result.

"Knowingly" means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

The requirement of "knowingly" is also established if it is shown that the defendant acted intentionally.

The Defendant argues that under State v. Page, 81 S.W.3d 781, 787 (Tenn. Crim. App. 2002), the trial court's definition of "knowingly" was incorrect and plain error. While we agree that the trial court erred in defining "knowingly" in the jury instructions, we conclude that the erroneous jury instruction was harmless.

Second degree murder is defined as "[a] knowing killing of another."[5] Tenn. Code Ann. § 39-13-210(a)(1) (1997). The term "knowing" is defined by statute as follows:

"Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Tenn. Code Ann. §§ 39-11-106(a)(20), -302(b) (1997). However, the Tennessee Supreme Court has explained that a knowing second degree murder is a "result-of-conduct" offense because the result of the conduct is the sole element of the offense. State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000). Therefore, the nature of the conduct that causes death or the manner in which one is killed is inconsequential under the second degree murder statute. Id. Because a knowing second degree murder is strictly a "result-of-conduct" offense, "a jury instruction that allows a jury to convict on second degree murder based only upon awareness of the nature of the conduct or circumstances surrounding the conduct improperly lessens the state's burden of proof. For second degree murder, a defendant must be aware that his or her conduct is reasonably certain to cause death." Page, 81 S.W.3d at 788.

---

[5] We note that second degree murder can also be committed by the killing of another which results from the unlawful distribution of certain drugs. Tenn. Code Ann. § 39-13-210(a)(2). This form of second degree murder was not at issue in this case.

In Page, this Court provided a correct jury instruction for knowing second degree murder, which included the following definition of "knowingly": "'Knowingly' means that a person acts with an awareness that [his] [her] conduct is reasonably certain to cause the death of the alleged victim. The requirement of 'knowingly' is also established if it is shown that the defendant acted 'intentionally.'" Page, 81 S.W.3d at 788. In this case, the trial court erred by including within its definition of "knowingly" the phrase, "a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." The trial court should have limited its definition of "knowingly" to the "result-of-conduct" definition instead of also including the "nature-of-conduct" and "nature-of-circumstances" definitions.

However, we conclude that the error in the jury instructions in this case constituted harmless error. While a defendant has the constitutional right to complete and accurate jury instructions on the law, "an erroneous jury instruction, which misstates the applicable conduct element of an offense and lessens the state's burden of proof, is . . . subject to constitutional harmless error analysis." Id. at 789. In Page, the defendant was convicted of second degree murder for causing the death of the victim by striking him in the back of the head with a baseball bat. Id. at 782. On appeal, this Court found that the trial court erred by including "nature-of-conduct" and "nature-of-circumstances" definitions of knowingly in its jury instructions and that the trial court's error was not harmless because the defendant's trial defense had been that he was intoxicated and unable to appreciate the consequences of his conduct at the time he hit the victim with the baseball bat. Id. at 789-90. However, this Court explained in Page:

> We recognize that in many, if not most, homicide trials, the *mens rea* jury instructions utilized in this case would be harmless error. If a victim is shot at point blank range with a twelve gauge shotgun while asleep, and the defense is the defendant was not the shooter, then the erroneous instruction would likely be harmless. In such a situation, *mens rea* is not a disputed issue at trial. Similarly, if causation is not disputed in a homicide trial, the failure to instruct the jury on causation may well be harmless. See State v. Farner, 66 S.W.3d 188, 206 (Tenn. 2001).

Page, 81 S.W.3d at 789. In Page, the trial court's jury instruction error was not harmless because *mens rea* was a disputed issue at trial and part of the defendant's defense.

In this case, by contrast, *mens rea* was not a disputed issue at trial. Here, the Defendant's defense was that he was not the shooter at all and that the witnesses had misidentified him. Thus, we conclude that the trial court's error of including the "nature-of-conduct" and "nature-of-circumstances" definitions in its definition of "knowingly" was harmless. Furthermore, we conclude that the trial court's jury instruction error was harmless because the trial court merged the

-14-

Defendant's second degree murder conviction with his felony murder conviction, thereby negating the error contained in the "knowingly" instruction for the second degree murder charge.[6]

Accordingly, based upon the foregoing authorities and reasoning, we AFFIRM the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE

---

[6] We note that the "knowingly" instruction given by the trial court was correct for the purpose of defining "knowingly" under the felony murder instruction. Unlike second degree murder, robbery is not a "result-of-conduct" offense, so the trial court's inclusion of the "nature-of-conduct" and "nature-of-circumstances" definitions of "knowingly" was proper under the felony murder instruction.